946 P.2d 32

**STATE of Hawai'i, Plaintiff–Appellee/Cross–Appellant,**

v.

**Raita FUKUSAKU, Defendant–Appellant/Cross–Appellee**

No. 19281.

Supreme Court of Hawai'i.

Sept. 16, 1997.

Addendum Remanding Case Oct. 16, 1997.

Reconsideration Denied Oct. 9, 1997.

464

Michael K. Tanigawa (Keith S. Agena with him on the briefs, of Char, Sakamoto, Ishii & Lum), Honolulu, for defendant-appellant/cross-appellee.

Caroline M. Mee, Deputy Prosecuting Attorney, Honolulu, for plaintiff-appellee/cross-appellant.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Defendant–Appellant/Cross–Appellee Raita Fukusaku (Defendant) appeals his convictions and sentences on two counts of murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–701.5 (1993).[1] Plaintiff–Appellee/Cross-Appellant State of Hawai'i (the Prosecution) cross-appeals various orders of the circuit court entered in the course of the proceedings. Pursuant to the procedure established in *Garringer v. State,* 80 Hawai'i 327, 909 P.2d 1142 (1996), we will withhold judgment on Defendant's convictions for thirty days. If the Prosecution, within that time, consents to resentencing without mandatory minimum terms under HRS § 706–660.1, we will affirm the convictions and remand for resentencing. If, on the other hand, the Prosecution does not

---

**1.** HRS § 707–701.5 (1993) provides in relevant part:

**Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

consent, we will vacate the convictions and remand for retrial.

## I. BACKGROUND

On February 23, 1994, at about 5:00 p.m., Honolulu firefighters responded to a fire at 1350 Ala Moana Boulevard, Penthouse 4, and found the body of Toako "Kototome" Fujita (Kototome) in a bedroom closet. She had been shot through the chest. At about 10:30 p.m. the same night, firefighters were summoned to the parking lot of the Park Shore Hotel, where they discovered a red Acura sports car on fire. The body of Kototome's son, Goro Fujita (Goro), was found on the front passenger seat. He had also been shot through the chest. On March 30, 1994, Defendant, an acquaintance of Goro's, was charged with one count of murder in the first degree[2] and two counts of murder in the second degree[3] in connection with the deaths of the Fujitas. As Defendant had returned to Japan by then, extradition proceedings were conducted and Defendant was returned to Honolulu in August 1994.

After extensive discovery and pretrial motions, opening statements were delivered on February 27, 1995. At trial, the Prosecution introduced evidence from the video surveillance system at the Discovery Bay Condominium. Discovery Bay, located at 1778 Ala Moana Boulevard, was the apartment complex in which Defendant had resided in Apartment 1306 of the Endeavour Tower. The videotapes showed Defendant entering a Discovery Bay elevator with Goro at 9:27 a.m. on February 23, 1994. Security guard Melvin Quartero subsequently entered the elevator on the 10th floor. The videotapes then showed Defendant and Goro getting out of the elevator on the 13th floor. Quartero confirmed, in his testimony, that they exited on the 13th floor and walked in the direction of Apartment 1306. Goro never again appeared in the Discovery Bay surveillance tapes. However, the videotapes did show

Defendant, at approximately 12:58 p.m., taking the elevator to the 9th floor, which led to the parking garage. Defendant was wearing a dark shirt and was carrying a white bag and a piece of cloth that could have been a jacket.

Gladys Brandt, a resident of 1350 Ala Moana Boulevard, testified that, at about 2:10 p.m., she saw a young man with wet, black hair, and dressed in a jacket, exit the elevator on the penthouse floor and hurry to the Fujita's apartment. Although Brandt had assumed that the man was Goro, she thought it was odd that he did not turn and say "hi" to her. Brandt could not identify Defendant as the man she saw that day.

Yoshiharu Satoh, chairman of the board of Central Pacific Bank, testified that, at about 2:55 p.m., he received a telephone call from Kototome. She said that it was an emergency and that she needed $20,000 in cash delivered to her. When Satoh told her that doing so would be against bank policy, she replied that it could affect someone's life. Then Kototome asked Satoh to explain to a person who was with her, in Japanese, that he could not bring the money. Satoh duly re-explained that he could not deliver the money and then asked Kototome what was going on. After three or four seconds of silence, the call was cut off. Because he did not have Kototome's telephone number, Satoh then called Junichi Uchida of the Japanese Consul General's Office and asked him to look into the matter.

Uchida testified that after receiving the call from Satoh, he located Kototome's phone number and tried to call her at about 3:45 p.m. When no one answered after ten rings, he hung up and called again. After several rings, Uchida thought he heard someone pick up the phone; however, when no one spoke, he hung up. Uchida then called a third time but only got the answering machine. Uchida called Satoh and told him what had hap-

---

**2.** HRS § 707–701 (1993) provides in relevant part:

**Murder in the first degree.** (1) A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:

(a) More than one person in the same or separate incident[.]

**3.** *See supra* note 1.

pened. Satoh then asked Uchida to go to Kototome's apartment.

Madeline Donnell, another resident of 1350 Ala Moana Boulevard, testified that, between 3:30 and 4:00 p.m., she saw a man come out of Penthouse 4 wearing a light blue top or jumpsuit and carrying white bags on a strap hanging from his left shoulder. Thinking it was Goro, she called out "Goro," but the man walked by without responding. She stated that Goro would normally respond with a nice greeting, so she assumed that he was late for school or had something on his mind. Donnell suffered from a degenerative eye disease and could not identify Defendant as the person she saw; however, she did say that the person was of Asian racial extraction.

Uchida arrived at 1350 Ala Moana Boulevard at approximately 4:30 p.m. and went to the manager's office in order to tell him that he wanted to go up to the Fujitas' apartment. About 10 minutes later, he arrived at the apartment and saw smoke coming out of the top portion of the door. He then waited for the firefighters, who arrived at about 5:00 p.m. The firefighters found Kototome's body in a closet.

Discovery Bay videotapes showed Defendant taking an elevator to the 13th floor at about 3:53 p.m., wearing the same clothes and carrying the same bag and cloth material. Subsequent sequences showed Defendant, dressed in plaid Bermuda shorts and a light-colored t-shirt with a square pattern on the back, entering the elevator with a hand truck at about 4:48 p.m. He took the elevator to the 13th floor and exited with the hand truck. The videotapes later showed the Defendant entering the elevator wearing the same clothing except with a pair of white gloves.

Diane Brusin, another resident of Discovery Bay, testified that between 8:00 and 10:00 p.m. she heard a loud gunshot. Brusin heard the gunshot while in the living room of her apartment—Apartment 1406. Brusin also testified that she was a former member of the Yugoslavian Olympic shooting team and was familiar with firearms.

The surveillance videotapes then showed Defendant, at about 9:08 p.m., attempting to hold the elevator door open by putting duct tape over the "open door" button. Subsequent sequences showed Defendant, wearing the square-patterned t-shirt, plaid Bermuda shorts, and white gloves, entering the elevator at about 9:15 p.m. He was using a hand truck to move a large object wrapped in cloth. The outline of the bundle resembled a body. He went to the 10th floor, which led to the parking garage, and exited with the hand truck and the bundle. At about 9:32 p.m., Defendant, without a shirt but still wearing the plaid Bermuda shorts, re-entered the elevator with a bag marked "Tokyo" resting on the hand truck and went to the 13th floor. The videotapes later showed Defendant, wearing long pants and a different light-colored t-shirt, taking the elevator at about 9:40 p.m. and eventually exiting on the 10th floor. The videotape from a parking garage security camera showed Goro's Acura sports car, which was identified by its license plate, leaving the garage at about 9:46 p.m. The tape showed a male driving the vehicle, and although his face was not visible, he was wearing a light-colored shirt. The front passenger seat was in a reclined position and there was a bundle on the seat.

At about 10:30 p.m., a bellman at the Park Shore Hotel in Waikiki heard a car alarm and, upon investigating, found a red sports car on fire. When firefighters arrived, they extinguished the fire and found Goro's body, bound with duct tape and wrapped in cloth, in the front passenger seat.

Security videotapes from an ABC Store across the street from Discovery Bay showed Defendant, wearing a light-colored t-shirt and long pants, buying Clorox, Woolite rug cleaner, air freshener, and a bottle of soda at about 10:33 p.m. The ABC salesclerk, Angelita Gamata, confirmed the purchase in her testimony. The Discovery Bay videotapes showed Defendant, wearing the same clothes and carrying ABC Store bags, taking the elevator to the 13th floor at about 10:36 p.m.

The videotapes then showed Defendant entering the elevator on the next day, February 24, 1994, at about 8:20 a.m. On a hand truck, he was transporting a love seat with a por-

tion of the bottom missing. He took the love seat to the basement, then re-entered the elevator with just the hand truck. He took the hand truck to the lobby, then returned to the 13th floor. At about 9:35 a.m., Defendant entered the elevator carrying a paper bag in his hands and exited on the 9th floor. Later, after returning to Discovery Bay, Defendant entered the elevator at about 7:44 p.m., carrying luggage, and exited on a floor with access to the parking garage.

On February 25, 1994, sanitation workers turned in some items to the police that they had discovered in a dumpster at Eaton Square. The items were found in brown paper bags and included a man's diving watch, Goro's identification and credit cards, a plastic bag containing a white powder (that looked like drugs but smelled like soap), a lady's wallet, and a lady's gold watch. On February 26, 1994, Shirley Bitonio turned in some items that she had found in the bed of her pickup truck, which had been parked along the Ala Wai Canal. The items were contained in a fanny pack, which itself was inside a brown paper bag. The items included Goro's and Kototome's passports, a man's ring, a coin purse, some credit cards, and a wallet containing Kototome's driver's license and Japanese currency. Inside the wallet was a checkbook that, upon closer examination, contained thirty-one $100 bills and eleven 10,000 yen bills hidden behind the checks.

Calvin Woods, an employee of Ala Moana Buy & Sell, a pawn shop, testified that Defendant came into the shop three times on February 25, 1994 in order to redeem a watch and to pawn various item, including some electronic appliances and some jewelry. Woods identified a number of distinctive pieces of jewelry as items that Defendant pawned that day for $1873. Chie Takagi, a long-time acquaintance of Kototome, later identified some of that jewelry as pieces she had seen Kototome wearing. Woods also testified that Defendant had previously talked to him about pawning a .357 magnum pistol. Woods inquired about the pistol on February 25, and Defendant replied that he was going to Los Angeles to visit a sick friend and would get the paperwork for the gun from his attorney there.

Kyoko Maehara, Defendant's travel agent, testified that she reserved a room for Defendant at the Waikiki Joy Hotel and that he moved into the hotel on February 24, 1994. She also testified that she booked a one-way ticket to Japan for Defendant on a flight leaving on February 25, 1994. She testified that she dropped Defendant off at the airport to take that flight.

Medical examiner Dr. Kanthi De Alwis testified that Kototome had died as a result of a gunshot wound entering above her left nipple and traveling downward through her heart and out her back. Bruising on her neck and small hemorrhages in her eyes indicated that she had also been strangled before she died and could have been unconscious. Kototome also had a cut on her lip, as well as bruises on her face, upper right arm, and left shoulder. She also had burns to her left leg; however, the condition of her skin indicated that she had been dead before suffering the burns.

Dr. De Alwis also testified that Goro had died of a gunshot wound entering above the left nipple and traveling out his lower back. Goro had a laceration above one eye, a yellowish stain on his face, and burns to his legs and left hand. Dr. De Alwis believed that the burns were post-mortem. Goro also had impressions on his ankles indicating that he had been bound with duct tape, and residual duct tape glue was found on his right wrist. Dr. De Alwis testified that the gunshot wounds suffered by Kototome and Goro were basically similar.

Investigators noticed that the Fujitas' apartment appeared to have been ransacked. The police recovered a bullet from a shoe box in the closet where Kototome's body was found. They also recovered a couple of pillows that had holes in them and appeared to be covered in blood. The police also recovered a jewelry box containing some pieces of jewelry. It appeared that a combustible liquid had been used as an accelerant and that fires had been intentionally set in two separate places. Investigators also recovered material from Goro's burned-out car. They recovered two light-colored pieces of material, possibly sheets, and something that looked like a bed pad. They also recovered a

gas cap, a lighter fluid can, a cotton work glove, and the burnt remains of another glove.

Tomoko Yatabe, a leasing agent for the company managing Apartment 1306, testified that the apartment was originally furnished with both a sofa bed and a matching love seat. However, the police found no love seat when they arrived at the apartment; they only found the sofa bed with the bed opened up. Beneath the open bed, and partially concealed by it, the police found that a six foot by eight foot section of the carpet had been removed, along with the underlying carpet pad. Other stains were found on the carpet, but these stains were never conclusively established to be blood. The police also recovered a half-inch piece of paper that appeared to have a small drop of blood on it. In the basement, the police found a love seat with a section of the bottom removed. From the love seat, the police recovered a bullet, blood samples, and some hair and fiber samples. They also recovered a hand truck that appeared to have bloodstains on the bottom portion.

Detective Charles Davis testified that analysis of the bullet recovered from the Fujitas' apartment and the bullet recovered from the love seat indicated that the caliber of both bullets was consistent with a .357 magnum or a .38 special. Furthermore, the bullets could have come from the same manufacturer and, based on a microscopic examination of the striations found on the bullets, they had been fired from the same gun. Police criminalist Tracy Tanaka testified that a hair recovered from the sofa bed in Apartment 1306 was consistent with Kototome's hair. He also testified that hair and fiber samples recovered from the love seat in the basement and from Goro's body were consistent with cat hair and carpet fibers found in Apartment 1306. Finally, DNA testing indicated that the blood on the slip of paper found in Apartment 1306, the blood on the hand truck, and the blood found on the love seat could have come from Goro.

Defense witness Cynthia Takahashi testified that on February 23, 1994, at about 4:45 p.m., a red Acura Integra cut in front of her on Ala Moana Boulevard and someone in the passenger seat stuck his middle finger at her.

Another defense witness, Filemina Erickson, testified that on February 23, 1994, at about 11:00 a.m., a white car nearly hit her while she was crossing the street. The driver of the car, a woman, then drove up to 1350 Ala Moana Boulevard, where a tall European man waved her over, opened the door for her, and walked into the building with her, hand-in-hand. Erickson stated that she recognized the woman as Kototome when she saw her face on television later. She testified that she did not tell the police about this incident because she had been angry at Kototome.

The defense also called Guido Giacometti, another resident of 1350 Ala Moana Boulevard. Giacometti testified that on February 23, 1994, at about 3:55 p.m., he saw a male in the elevator going down. He testified that the person appeared to be a Japanese national, twenty-five to thirty-five years of age, five feet eight or nine inches in height, and of thin to average build. He noticed that the man was well-dressed, wearing a two-tone knit sport shirt, well-tailored slacks, and an expensive gold wristwatch with a gold band. He noted that the man was carrying a key with a black plastic handle, similar to one that would operate a Mercedes or a Ford. The key was attached to a black remote control for a car door or alarm. Defense counsel had earlier alleged that this description matched an employee of Alii Divers, a dive shop that Goro had frequented. However, when shown pictures of Goro, Defendant, and all the employees of Alii Divers, Giacometti could not identify any of them as the man he had seen.

On May 22, 1995, Defendant was acquitted of murder in the first degree, but was found guilty of two counts of murder in the second degree. The Prosecution moved for imposition of mandatory minimum terms of imprisonment and consecutive sentencing. Following a hearing, the circuit court sentenced Defendant, for each count, to life imprisonment with the possibility of parole and a mandatory minimum term of fifteen years. The sentences for each count were to be served consecutively.

Defendant filed a timely notice of appeal, and the Prosecution filed a notice of cross-appeal.

## II. *DISCUSSION*

### A. *Defendant's Appeal*

Defendant raises seven issues in his appeal, each of which will be addressed in turn.

#### 1. *Requirement of a Hearing on the Reliability of the Hair and Fiber Evidence*

On February 27, 1994, just prior to presentation of opening statements, defense counsel argued that a separate hearing should be held, pursuant to Hawai'i Rules of Evidence (HRE) Rule 104,[4] to determine the admissibility of the Prosecution's hair and fiber evidence. The trial court denied the request and proceeded with opening statements. On March 15, 1994, defense counsel renewed the request, and the trial court responded as follows:

THE COURT: Well, counsel, *hair is not in the nature of scientific evidence as such, if you look at the case law, it's not subject to, uh, the kind of [Daubert] scrutiny that's required of DNA and luminol.*

[DEFENSE COUNSEL]: ... I asked the Court for a 104 hearing, it wasn't given, but again I think that one is necessary for the hair.

THE COURT: I don't think so, and—and the reason is what I've stated, I think that, um, under [*Daubert*], [*Daubert*] applies to scientific evidence and that there is language in [*Daubert*] requiring the Court to conduct, um, a hearing outside the presence of the jury with respect to so-called, uh, scientific evidence. And *I do not believe that hair analysis like ballistic analysis is in the nature of scientific evidence.*

*There are laboratory techniques, uh, I guess that have been developed over the years and I believe that the case law in this area, um, suggests that it is not subject to scientific scrutiny as such. They're laboratory techniques, and they—they operate under different standard and different standard of evidentiary admissibility, so if—*

. . . .

[DEFENSE COUNSEL]: Your Honor, at some point during the State's presentation of evidence they're going to have to put someone on the stand, qualify them as an expert and have them give an opinion that in their opinion this hair is—this sample is consistent with this known or this piece of evidence that was recovered. I mean, it's much like a fingerprint comparison by Russell Crosson.

THE COURT: That's right, they're—they're all similar types of evidence, counsel, and *they're not treated as scientific evidence, they're—they're different kind of evidence.*

. . . .

THE COURT: *[T]hey are not, as far as I have determined to be the nature of scientific evidence that requires a pretrial determination of reliability as to this extent.*

(Emphases added.)

On appeal, Defendant argues that the trial court should not have allowed expert testimony on the hair and fiber samples without first requiring the Prosecution to establish the reliability of the expert's conclusions. Defendant argues that in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that it is the trial court's responsibility to make certain that the scientific evidence presented is reli-

---

4. HRE Rule 104 provides in relevant part:

**Preliminary questions.** (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

. . . .

(c) Hearing of jury. Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be conducted when the interests of justice require or, when an accused is a witness, if the accused so requests.

able.[5] Furthermore, argues Defendant, the need for a judicial determination of reliability is not limited to novel scientific procedures. *See id.* at 592 n. 11, 113 S.Ct. at 2796 n. 11 ("Although the *Frye* decision [which *Daubert* overruled] itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of [Federal Rules of Evidence (FRE) ] Rule 702 to apply specially or exclusively to unconventional evidence."). Defendant relies upon *Williamson v. Reynolds*, 904 F.Supp. 1529 (E.D.Okla.1995),[6] in which a federal district court conducted a *Daubert* analysis of hair and fiber evidence and ruled that such evidence is scientifically unreliable. *Id.* at 1558.

The Prosecution's response is that hair and fiber evidence is reliable. The Prosecution notes that the overwhelming majority of cases have found such evidence to be reliable and admissible.[7]

The trial court's decision was apparently based on the distinction between "scientific evidence" and "laboratory techniques." The trial court apparently ruled that while scientific evidence is subject to a *Daubert* reliability analysis, laboratory techniques are not. Although the trial court did not specifically cite authority for this distinction, it appears to have relied on certain statements in *Daubert.* In *Daubert,* the Court noted that FRE Rule 702 applies to "scientific, technical, or other specialized knowledge." *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2794. The Court,

however, was careful to limit its holding in *Daubert* to "scientific knowledge." *Id.* at 590 n. 8, 113 S.Ct. at 2795 n. 8. Thus, the trial court in the present case apparently ruled that hair and fiber evidence is "technical knowledge" rather than "scientific knowledge" and was therefore not subject to a separate reliability determination.

■ "Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion." *State v. Maelega,* 80 Hawai'i 172, 180, 907 P.2d 758, 766 (1995).

■ This court has followed a two-pronged analysis when addressing proposed expert testimony. *State v. Samonte,* 83 Hawai'i 507, 533, 928 P.2d 1, 27 (1996); *Maelega,* 80 Hawai'i at 180–81, 907 P.2d at 766–67; *State v. Montalbo,* 73 Haw. 130, 138–40, 828 P.2d 1274, 1280–81 (1992); *State v. Kim,* 64 Haw. 598, 604–05, 645 P.2d 1330, 1336 (1982), *overruled on other grounds, State v. Batangan,* 71 Haw. 552, 799 P.2d 48 (1990). We have held that:

> The critical inquiry with respect to expert testimony ... is whether such testimony "will *assist the trier of fact to understand the evidence or determine a fact in issue....*" [HRE 702.] Generally, in order to so assist the jury an expert must base his [or her] testimony upon a sound factual foundation; any inferences or opin-

---

**5.** In *Daubert,* the Court noted that four factors influence the reliability inquiry: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) widespread acceptance in the relevant scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97.

**6.** On appeal, the United States Court of Appeals for the Tenth Circuit affirmed the district court's decision based on petitioner's ineffective assistance of counsel claim. *Williamson v. Ward,* 110 F.3d 1508, 1510 (10th Cir.1997). However, the Tenth Circuit specifically *reversed* the district court's ruling on the admissibility of hair analysis evidence because the district court had applied the wrong standard. *Id.* at 1522–23.

**7.** The Prosecution cites the following cases as examples: *United States v. Hickey,* 596 F.2d 1082, 1089 (1st Cir.), *cert. denied,* 444 U.S. 853,

100 S.Ct. 107, 62 L.Ed.2d 70 (1979); *United States v. Brady,* 595 F.2d 359, 362–63 (6th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); *United States v. Cyphers,* 553 F.2d 1064, 1071–73 (7th Cir.), *cert. denied,* 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977); *Jent v. State,* 408 So.2d 1024, 1028–29 (Fla. 1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982); *Robinson v. State,* 18 Md.App. 678, 308 A.2d 734, 744–45 (1973); *Commonwealth v. Tarver,* 369 Mass. 302, 345 N.E.2d 671, 676–77 (1975); *State v. White,* 621 S.W.2d 287, 292–93 (Mo.1981); *People v. Allweiss,* 48 N.Y.2d 40, 421 N.Y.S.2d 341, 346, 396 N.E.2d 735 (1979); *State v. Green,* 305 N.C. 463, 290 S.E.2d 625, 629–30 (1982); *State v. Kersting,* 50 Or.App. 461, 623 P.2d 1095, 1098–1102 (1981), *aff'd,* 292 Or. 350, 638 P.2d 1145 (1982); *State v. Batten,* 17 Wash.App. 428, 563 P.2d 1287, 1292–93, *review denied,* 89 Wash.2d 1001 (1977).

ions must be the product of an *explicable and reliable system of analysis;* and such opinions must add to the common understanding of the jury. *See* [HRE Rule 703].

*Maelega,* 80 Hawai'i at 181, 907 P.2d at 767 (quoting *Montalbo,* 73 Haw. at 138, 828 P.2d at 1280) (emphases and alterations in original). Furthermore, after a 1992 amendment, HRE Rule 702 provides as follows:

> **Testimony by experts.** If scientific, technical, or other specialized knowledge will *assist the trier of fact to understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider *the trustworthiness and validity of the scientific technique or mode of analysis* employed by the proffered expert.

(Emphases added.) In short, expert testimony must be (1) relevant and (2) reliable. *Samonte,* 83 Hawai'i at 533, 928 P.2d at 27; *Maelega,* 80 Hawai'i at 181, 907 P.2d at 767. In addition, "the trial court must determine whether admitting such evidence will be more probative than prejudicial." *Maelega,* 80 Hawai'i at 181, 907 P.2d at 767 (internal quotation marks omitted); *see also* HRE Rule 403.[8]

Therefore, reliability is an essential part of the analysis we apply to the admission of expert testimony. Nevertheless, in addressing the reliability prong, our case law suggests that scientific knowledge is distinguishable from other types of knowledge. In *Maelega,* the defendant argued that the proffered expert testimony on domestic violence was unreliable as scientific knowledge because it was not empirically testable. *Maelega,* 80 Hawai'i at 182, 907 P.2d at 768. In response, this court noted that the United States Supreme Court in *Daubert* had expressly limited its holding to scientific knowledge, as opposed to technical or other

specialized knowledge. *Id.* We further noted that expert testimony on domestic violence constitutes "specialized knowledge." *Id.* at 183, 907 P.2d at 769. *See also State v. Clark,* 83 Hawai'i 289, 298–99, 926 P.2d 194, 204–05, *reconsideration denied,* 83 Hawai'i 545, 928 P.2d 39 (1996); *State v. Cababag,* 9 Haw.App. 496, 508, 850 P.2d at 722, *cert. denied,* 74 Haw. 652, 853 P.2d 542 (1993). We then upheld the admission of the testimony and implicitly rejected the defendant's contention. *Maelega,* 80 Hawai'i at 182, 907 P.2d at 768. Thus, under *Maelega,* "specialized knowledge" may be deemed reliable even if it is not empirically testable. This suggests that expert testimony involving other types of knowledge may be treated differently than "scientific knowledge."

 We agree with the trial court's approach to this issue. "Scientific knowledge" must be distinguished from "technical knowledge." Expert testimony deals with "scientific knowledge" when it involves the validity of the scientific principles and the reliability of the scientific procedures themselves. In contrast, expert testimony deals with "technical knowledge" when it involves the mere technical application of well-established scientific principles and procedures. In such a situation, because the underlying scientific principles and procedures are of proven validity/reliability, it is unnecessary to subject technical knowledge to the same type of full-scale reliability determination required for scientific knowledge. Thus, although technical knowledge, like all expert testimony, must be both relevant and reliable, its reliability may be presumed.

The principles and procedures underlying hair and fiber evidence are overwhelmingly accepted as reliable. As one treatise notes, "[t]he cases in which courts have excluded hair evidence are so rare that they literally amount to only a handful of precedents.... In contrast to the few cases excluding hair evidence, a large body of case law reflects the courts' receptivity to hair analysis." P.

---

**8.** HRE Rule 403 provides:

> **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed

by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Giannelli & E. Imwinkelried, *Scientific Evidence* § 24–3, at 360–61. *See also* G. Sarno, *Annotation—Admissibility and Weight, in Criminal Case, of Expert Testimony or Scientific Evidence Respecting Characteristics and Identification of Human Hair,* 23 A.L.R.4th 1199 (1983); cases cited *supra* note 7. Hawai'i law also supports the reliability of hair and fiber evidence. This court and the Intermediate Court of Appeals (ICA) have affirmed convictions in which the prosecution relied upon hair and fiber evidence. *See, e.g., State v. Edwards,* 81 Hawai'i 293, 296, 916 P.2d 703, 706 (1996); *State v. Liuafi,* 1 Haw.App. 625, 634, 623 P.2d 1271, 1277 (1981). In *State v. Wilkins,* 1 Haw.App. 546, 622 P.2d 620 (1981), the ICA noted that trial courts have broad discretion in admitting expert testimony and cited federal case law as follows:

> [T]he Seventh Circuit Court of Appeals in an appeal of a bank robbery conviction upheld the admission into evidence of expert testimony that hairs recovered from the articles used by the appellant in the robbery were "microscopically like" hair samples taken from the appellant, even though there was admitted to be an insufficient basis to conclude that the hairs did, in fact, come from the defendant.

*Id.* at 553, 622 P.2d at 625 (citing *United States v. Cyphers,* 553 F.2d 1064 (7th Cir. 1977)). The one case cited by Defendant for the proposition that hair and fiber evidence is unreliable is no longer valid authority. Although the Tenth Circuit affirmed *Williamson* on other grounds, it specifically reversed the district court's ruling on the admissibility of hair analysis evidence. *See supra* note 6.

Because the scientific principles and procedures underlying hair and fiber evidence are well-established and of proven reliability, the evidence in the present case can be treated as "technical knowledge." Thus, an independent reliability determination was unnecessary. The trial court did not abuse its discretion in refusing to hold a reliability hearing. Additionally, we note that there is no indication in the record that the manner in which the hair and fiber analysis was conducted in this case was technically deficient.

The relevancy of the evidence and the balancing of probative value against prejudicial effect have not been challenged. Therefore, the trial court did not abuse its discretion in admitting the evidence.

### 2. Suppression of Statements and Derivative Evidence

■ Prior to trial, Defendant filed three motions to suppress evidence that collectively sought to suppress: (1) the statements Defendant made to the Japanese police on March 4 and 5, 1994; (2) the statements Defendant made at his extradition proceedings on June 17 and July 1, 1994; and (3) any other derivative evidence obtained as a result of the statements. Defendant argued that the statements were inadmissible because they had been obtained through coercion and because he had not been informed of his *Miranda*[9] rights. The trial court denied all three motions on the grounds that the Prosecution had agreed not to use the statements at trial for any purposes and that Defendant had failed to specify any other derivative evidence.

Defendant argues on appeal that the motions should have been granted. He argues that the burden was on the Prosecution to show that subsequently obtained evidence was from an independent source or that the taint was otherwise dissipated. Defendant argues that the trial court essentially shifted the burden to the defense to prove the evidence was tainted by the illegally obtained statement.

Even assuming *arguendo* that Defendant's statements were improperly obtained, the issue of whether the trial court should have suppressed the statements is moot.

It is well-settled that the mootness doctrine encompasses the circumstances that destroy the justiciability of a case previously suitable for determination. A case is moot where the question to be determined is abstract and does not rest on existing facts or rights. Thus, the mootness doctrine is properly invoked where events have so affected relations between the parties that the two conditions for justiciabili-

---

**9.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ty relevant on appeal—adverse interest and effective remedy—have been compromised.

*AIG Hawai'i Ins. Co., Inc. v. Bateman*, 82 Hawai'i 453, 458–59, 923 P.2d 395, 400–01 (1996) (quoting *In re Application of J.T. Thomas*, 73 Haw. 223, 225–26, 832 P.2d 253, 254 (1992)). The remedy for an unlawfully obtained statement is the suppression of that statement as evidence. However, Defendant's statements made on March 4, March 5, June 17, and July 1, 1994 were never introduced at trial. Because Defendant's statements were never introduced, he has essentially received the requested remedy already. Thus, the suppression of the statements is moot.

As for the suppression of derivative evidence, the "fruit of the poisonous tree" doctrine "prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police." *State v. Medeiros*, 4 Haw.App. 248, 251 n. 4, 665 P.2d 181, 184 n. 4 (1983) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). However, not all derivative evidence is inadmissible:

> Admissibility is determined by ascertaining whether the evidence objected to as being the 'fruit' was discovered or became known by the exploitation of the prior illegality or by other means sufficiently distinguished as to purge the later evidence of the initial taint. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Where the government proves that the evidence was discovered through information from an independent source or where the connection between the illegal acts and the discovery of the evidence is so attenuated that the taint has been dissipated, the evidence is

not a "fruit" and, therefore, is admissible. *Wong Sun v. United States, supra.*

*Id. See also State v. Lopez*, 78 Hawai'i 433, 447, 896 P.2d 889, 903 (1995); *State v. Pau'u*, 72 Haw. 505, 509–10, 824 P.2d 833, 836 (1992). In the present case, Defendant failed to specify what items of derivative evidence he sought to suppress. In other words, he failed to describe the "fruit" to which the "fruit of the poisonous tree" doctrine would be applied. As *Medeiros* suggests, evidence must first be "objected to as being the 'fruit' " before the government can be expected to prove that it was discovered through an independent source. *Medeiros*, 4 Haw.App. at 251 n. 4, 665 P.2d at 184 n. 4. While the prosecution "has the ultimate burden of persuasion to show that its evidence is untainted," the defendant "must go forward with *specific* evidence demonstrating taint." *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969) (emphasis added). Furthermore, from a practical point of view, if the defendant does not identify specific items of derivative evidence, the trial court cannot know which items to include within the suppression order. Insofar as the defendant in the present case failed to satisfy his initial burden of identifying the evidence to be suppressed, the trial court committed no error.[10]

### 3. *Discovery Violations by the Prosecution*

On August 24, 1994, Defendant filed his first motion to compel discovery or in the alternative dismiss indictment. After a hearing, the trial court, on September 12, 1994, entered its findings of fact, conclusions of law, and order granting in part and denying in part Defendant's motion. The trial court ordered, *inter alia:*

> [B]ecause any or all of these requested documents, exhibits, and/or evidence [used in the extradition proceedings in Japan]

---

**10.** Defendant's vague claims in the three instant suppression motions should be contrasted with the claim in Defendant's eleventh suppression motion. In this motion, Defendant moved to suppress the videotapes and other evidence obtained from the ABC Store near Discovery Bay, arguing that the only way Honolulu police could have learned that Defendant had gone there was through his statements to Japanese police. However, after a hearing, the trial court denied the

motion on the grounds that the evidence had been obtained from an independent source. Discovery Bay videotapes showed Defendant returning to his apartment carrying a bag with an ABC Store logo. It was the Discovery Bay videotapes that induced Honolulu police detectives to investigate ABC Stores in the area, not Defendant's statements in Japan. The eleventh motion to suppress has not been challenged in the present appeal.

may be relevant to Defendant's appearance before this Court, it respectfully orders those items be given to the Defense.... This includes those items specifically within the possession of the State and *those items which may be obtained through due diligence from the Japanese Government.* (Emphasis added.) Subsequently, the defense complained that it was still uncertain as to what happened in Japan and that there were gaps in the information provided by the Prosecution. The trial court reminded the Prosecution of its duty to exercise due diligence in obtaining the extradition documents. The Prosecution responded that it did not have extradition documents in its possession and that it could not make a direct request to Japanese officials because, due to treaty provisions, such a request would have to be made through diplomatic channels. Subsequently, however, a deputy prosecuting attorney revealed to the trial court that she had had direct contacts with Japanese officials to clarify information that those officials had wanted in a supplemental affidavit. On February 21, 1995, the trial court asked the Prosecution to explain the apparent conflict with its prior statement. The trial court had understood the Prosecution to mean that any direct communication with Japanese officials was improper. The Prosecution explained that it had not meant that *all direct contact* was prohibited, but rather, that *direct requests for documents* were improper and such requests had to made through diplomatic channels. The trial court then ordered the Prosecution to make a direct request in writing to Japanese officials for the extradition documents. Subsequently, after the Prosecution complied with the trial court's order, the Japanese government formally protested the direct request. Nevertheless, the transcripts of the extradition hearings were sent to the United States Embassy. At a hearing on March 3, 1995, the Prosecution revealed that it had been informed in a "note verbal" (*i.e.,* a diplomatic note) delivered on January 26, 1995, that the Japanese government was prepared to release the extradition documents if it received assurances that the extradition proceedings would not be challenged. The Prosecution further explained that it had responded to the note by informing the Japanese government that it could not give assurances on behalf of the Defendant. As a result of this answer, further activity on the matter had ceased. When the trial court asked the Prosecution why it had failed to inform the court and the defense about the Japanese government's request for assurances, the Prosecution replied that it had been waiting for clarification from the Japanese government.

Defendant also revealed that the Prosecution had failed to produce a letter from a "Steven Shea" that accused Reynold Hirazumi, the owner of Ala Moana Buy & Sell and a potential witness for the Prosecution, of keeping false books and buying and concealing stolen property. The Prosecution explained that, after the letter had been received, the police were asked to investigate the allegations contained therein. The letter was returned to the Prosecution in November or December 1994, but without having been investigated. The letter was then sent back to the police for the investigation that had originally been requested and was not finally returned to the Prosecution until December 22, 1994. The letter was turned over to the defense on December 27, 1994.

Defendant eventually filed a motion to dismiss the indictment based on the Prosecution's alleged misconduct in committing repeated discovery violations. In its findings of fact, conclusions of law, and order denying the motion to dismiss, the trial court found that the Prosecution had been remiss in disclosing the extent of its direct contact with the Japanese government. The trial court found that the court and the defense had been led to believe that direct contact between the Prosecution and the Japanese government had been minimal or non-existent. The trial court also found that, while it had been true that the Prosecution could not speak on behalf of the defense in responding to the Japanese government's request for assurances, the Prosecution could have at least notified the court and the defense and had been remiss in failing to do so. The trial court, however, found that due to the Japanese government's formal protest, it was true that requests for documents from Japan had to be made through diplomatic channels, that

the Prosecution was bound by the requirements of diplomacy, and that the Japanese government controlled whether documents would be produced or not.[11] The trial court concluded that there was no intentional misconduct requiring dismissal of the case and/or mistrial and the motion was denied. Nevertheless, the trial court imposed sanctions in the amount of $300 on each of the two prosecutors involved, to be paid from personal funds, for failing to notify the court and the defense about the Japanese government's request for assurances.[12]

Defendant subsequently filed a second motion to dismiss based on alleged discovery violations. Defendant argued that the Prosecution had failed to disclose certain documents obtained from Japan. These documents included: a paper addressing the exchange of information between the Japanese National Police Agency (NPA) and the Honolulu Police Department (HPD); a summary of Defendant's Japanese counsel's opinion of the extradition proceedings; and NPA background checks of Defendant, his girlfriend, and the Fujitas. In denying the motion, the trial court noted that the undisclosed documents confirmed that there had been direct contact between the Prosecution and the Japanese government. The trial court noted that, while there had been a direct exchange of information and documents, there was no evidence that the Prosecution had control over when and to what extent the Japanese government was willing to cooperate outside of diplomatic channels. The trial court additionally found that Defendant had suffered no prejudice and had not been deprived of a fair trial because the documents appeared to be of little evidentiary value, were neither inculpatory nor exculpatory, and did not appear to provide the Prosecution with any unfair advantage at trial. The trial court concluded that there had been no showing that Defendant's right

to a fair trial had been prejudiced and that the recess in trial proceedings from March 7 to March 20, 1995 would allow the defense time to review the undisclosed documents and prepare for trial. Thus, the motion was denied. However, the trial court imposed a $250 sanction on one of the prosecutors for failing to disclose the documents.

On appeal, Defendant notes that the defense strategy at trial involved Kototome's alleged connection with Japanese government officials and organized crime. Defendant argues that "the State engaged in a pattern of delaying discovery and hindering Appellant's inquiries in this area." Thus, Defendant argues, he was deprived of his right to a fair trial and due process of law.

The Prosecution argues in response, and in its own cross-appeal, *see infra* part II.B.1., that it was not obligated to produce the material sought by Defendant because such discovery was not authorized under Hawai'i Rules of Penal Procedure (HRPP) Rule 16. The Prosecution argues that HRPP Rule 16 does not extend to documents held by foreign governments. Furthermore, argues the Prosecution, Defendant was not prejudiced by the failure to produce the Steven Shea letter or the other undisclosed documents.

 We agree with the Prosecution. Before determining whether the alleged discovery violations warrant vacating the convictions, it must first be determined whether the underlying discovery orders were valid. If the trial court's discovery orders were not authorized under HRPP Rule 16, then the Prosecution's failure to comply with those orders cannot be a discovery violation. *Cf. Lothspeich v. Sam Fong*, 6 Haw.App. 118, 123, 711 P.2d 1310, 1314 (1985) (holding that, in an appeal from sanctions imposed for civil discovery violations, the appellate court will consider the propriety of the underlying discovery order). "The scope of discovery is

---

11. It should be noted that, at this point, Defendant had already obtained the extradition documents from his own sources. It should also be noted that Defendant eventually waived his right to challenge the extradition judgment and that the Japanese government produced the extradition transcripts.

12. During the same hearing, the court addressed other discovery matters and then imposed a total of $820 in additional sanctions on one of the prosecutors. Although it is not entirely clear from the record, these sanctions appear to be the result of the Prosecution's delay in performing discovery in general and were not specifically related to the extradition documents issue.

reviewed for an abuse of discretion." *State v. Estrada,* 69 Haw. 204, 216, 738 P.2d 812, 821 (1987).

■ The trial court's order to obtain the documents "through due diligence from the Japanese Government" was apparently based on HRPP Rule 16(b)(2), which provides:

*Disclosure of Matters Not Within Prosecution's Possession.* Upon written request of defense counsel and specific designation by defense counsel of *material or information which would be discoverable if in the possession or control of the prosecutor and which is in the possession or control of other government personnel, the prosecutor shall use diligent good faith efforts to cause such material or information to be made available to defense counsel;* and if the prosecutor's efforts are unsuccessful the court shall issue suitable subpoenas or orders to cause such material or information to be made available to defense counsel.

(Underscoring of heading in original.) (Emphasis added.) Thus, the question is whether foreign government officials can be considered "other government personnel" within the meaning of the rule. The notes accompanying the 1975 proposed draft of the HRPP provide persuasive guidance in interpreting this provision:

Both subsections (b)(1) and (b)(2) [now combined into (b)(1) ] deal with matters within the prosecutor's possession or control. *Subsection (b)(3) [now renumbered (b)(2) ] deals with matters which would be discoverable if they were within the prosecutor's possession or control but which are with some other state agency.* This rule is directed to situations where the prosecutor is unaware of the evidence but the defense is, and the burden is therefore on the defense to specify exactly what and where the evidence is which it seeks to obtain. This rule is not intended to permit a "fishing" expedition through the prosecutor by means of requests phrased in general terms. This subsection is taken from ABA Standard 2.4, and requires the prosecutor to make diligent efforts to get the evidence and the court to issue a subpoena if the prosecutor is unsuccessful.

Note to Rule 16, Proposed HRPP, at 134 (1975) (emphasis added). From this quotation, it is clear that the drafters of HRPP Rule 16 envisioned that subsection (b)(2) would apply only when documents are held by "other *state* agenc[ies]." In the present case, the extradition documents were in the possession of agencies of the Japanese government. Obviously, agencies of a foreign government do not qualify as agencies of the State of Hawai'i or its subdivisions. Thus, the orders of the trial court relating to the extradition documents from Japan were not authorized under HRPP Rule 16, and the court abused its discretion in issuing the orders. Consequently, the Prosecution did not commit a discovery violation in failing to comply with them.

Furthermore, there is no indication in the record that any other possible discovery violations warrant vacating the convictions. "We have long recognized that 'violation of Rule 16 does not warrant an immediate declaration of a mistrial by the trial court.' " *State v. Okumura,* 78 Hawai'i 383, 401, 894 P.2d 80, 98 (1995) (quoting *State v. Sugimoto,* 62 Haw. 259, 262, 614 P.2d 386, 389 (1980)). "[B]efore the [trial] court orders dismissal of a case because of the State's violation of HRPP Rule 16, it must consider whether less severe measures would rectify prejudice caused to the defendant by the violation." *State v. Dowsett,* 10 Haw.App. 491, 495, 878 P.2d 739, 742, *cert. denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994). "In exercising its broad discretion as to sanctions, the trial court should take into account the reasons why the disclosure was not made, the extent of prejudice, if any, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *Okumura,* 78 Hawai'i at 401, 894 P.2d at 98 (quoting *State v. Moriwaki,* 71 Haw. 347, 355, 791 P.2d 392, 396, *reconsideration denied,* 71 Haw. 665, 833 P.2d 900 (1990)).

■ In the present case, the Prosecution's disclosure of the Shea letter was tardy because the letter had been sent to the police in order to investigate the allegations contained therein. Furthermore, the apparent value of the Shea letter to the defense was that it impeached the credibility of Reynold

Hirazumi. However, the Prosecution never called Hirazumi as a witness; instead, the Prosecution relied on the testimony of Calvin Woods, one of Hirazumi's employees. Also, the letter was disclosed to Defendant on December 27, 1994; insofar as Calvin Woods testified on April 12, 1995, the defense had ample time to investigate the letter. As for the other documents the Prosecution failed to disclose, they were not exculpatory, a recess was scheduled from March 7 to March 20, 1995 (during which the defense could have reviewed the documents), and the trial court imposed a $250 sanction on the Prosecution. Thus, under these circumstances, the trial court did not abuse its discretion in failing to dismiss the charges.

 A discovery violation can also constitute a so-called *Brady* violation, which infringes upon the defendant's due process right to a fair trial. *See Moriwaki*, 71 Haw. at 356, 791 P.2d at 397. "[T]he suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment, regardless of the good faith or bad faith of the prosecution." *State v. Matafeo*, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990) (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963)). "However, in order to establish a *Brady* violation, an appellant must make a showing that the suppressed evidence would create a reasonable doubt about the [a]ppellant's guilt that would not otherwise exist." *Okumura*, 78 Hawai'i at 402, 894 P.2d at 99 (internal quotation marks and brackets omitted).

In the present case, the Shea letter had no tendency to create a reasonable doubt as to Defendant's guilt. It merely collaterally impeached a witness, who in fact never testified before the jury. As for the undisclosed documents, they demonstrated that direct contact occurred between the Prosecution and Japanese officials. However, it was already known that such direct contacts took place, and the documents did nothing to create reasonable doubt as to Defendant's guilt.

Therefore, we hold that the alleged discovery violations do not require vacating Defendant's convictions.

#### 4. Ineffective Assistance of Counsel

 The theory of the defense at trial was that Kototome and Goro Fujita were murdered by members of Japanese organized crime. According to this theory, Kototome's business [13] brought her into conflict with underworld figures. Thus, the defense attempted to suggest that Defendant was a mere pawn of organized crime and had become involved with the murders under duress. On appeal, Defendant argues that trial counsel provided ineffective assistance by failing to support this theory with evidence. Defendant points to two alleged errors or omissions in support of his ineffective assistance of counsel claim. First, trial counsel called only Bernard Ching, a security guard from Sears, to provide expert testimony as to the practices of Asian organized crime. Ching was not allowed to testify because he lacked current knowledge; therefore, no expert testimony on organized crime was presented. Second, trial counsel failed to obtain the testimony of Keiko Sakahara, Kototome's personal secretary. Sakahara allegedly would have testified to Kototome's connection to Japanese organized crime. The Prosecution had originally intended to call her as a witness; however, she fell ill with cancer and the Prosecution decided not to call her. Defendant argues that trial counsel's failure to obtain her testimony constituted an error or omission rising to the level of ineffective assistance. Defendant argues that trial counsel's errors or omissions made it impossible to establish his duress defense, thereby depriving him of a potentially meritorious defense.

 This court has long held that when an ineffective assistance of counsel claim is raised, the question is: "When viewed as a whole, was the assistance provided to the defendant within the range of competence demanded of attorneys in criminal cases?" *State v. Edwards*, 81 Hawai'i 293,

---

**13.** Chie Takagi testified that Kototome was a business consultant and that the nature of her consulting work involved serving as a conduit or messenger through which Shinto gods could speak.

300, 916 P.2d 703, 710 (1996). This court has also held that

> the defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

*Id.* (quoting *State v. Silva*, 75 Haw. 419, 439–40, 864 P.2d 583, 593 (1993)). "Determining whether a defense is 'potentially meritorious' requires an evaluation of the possible, rather than the probable, effect of the defense on the decision maker.... Accordingly, no showing of 'actual' prejudice is required to prove ineffective assistance of counsel." *Dan v. State*, 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994).

In our view, trial counsel's performance did not constitute ineffective assistance of counsel for the following reasons. First, it is difficult to say that the failure of trial counsel to obtain expert testimony on Japanese organized crime constitutes an "error[ ] or omission[ ] reflecting counsel's lack of skill, judgment, or diligence." Trial counsel called Bernard Ching to provide expert testimony. During voir dire, Ching testified that he had been an HPD police officer for twenty-five years and had been a detective in the Intelligence Division. He testified that he had been one of the pioneers in investigating Japanese organized crime in the United States. He had been qualified as an expert in Hawai'i courts and had testified before the United States Congress on this subject. Thus, Ching was more than just a Sears security guard. And although he had been retired from the HPD since 1985, he still kept up with the literature on Asian organized crime "somewhat." The reason the trial court refused to qualify him as an expert was that, after his retirement, he did not receive daily information to keep him informed of current trends regarding Japanese organized crime in Hawai'i. In short, Ching possessed impressive credentials and, as far as trial counsel could know, the trial court might well have qualified him as an expert

witness. It is not the fault of trial counsel that the court found Ching's expertise out of date and refused to qualify him. The ruling of the trial court was something beyond the control of trial counsel. Furthermore, trial counsel cannot be blamed for failing to obtain a replacement for Ching. Trial counsel had previously attempted to obtain FBI Agent John Ferreira as an expert on Japanese organized crime; however, the trial court found that Ferreira's testimony was not authorized under federal regulations, was not relevant, and would only have confused the jury. In short, under these circumstances, trial counsel cannot be held responsible for the trial court's rulings.

Similarly, it is difficult to say that the failure of trial counsel to obtain the testimony of Keiko Sakahara constituted an "error[ ] or omission[ ] reflecting counsel's lack of skill, judgment, or diligence." The Prosecution had originally intended to bring her from Japan to testify. Given the expense of transporting a witness from Japan, it was reasonable for the defense to rely upon the Prosecution to bring her to Hawai'i. However, she subsequently became ill with cancer and was expected to live for only a couple of months. The Prosecution then decided not to call her. Surely, the illness of a witness is beyond the control of trial counsel. The trial court, as well as counsel for both sides, then attempted to devise a means of obtaining her testimony through deposition; however, the deposition had to be taken at the United States Embassy, and Sakahara had been admitted to a hospital a hundred miles away. Defense counsel then suggested using Defendant's Japanese attorneys and the Tokyo prosecutors as proxies who could take her deposition at the hospital. However, the trial court questioned whether the deposition would be valid because those attorneys would not be licensed in the State of Hawai'i. The Prosecution also refused to consent to the proxy arrangement by stipulation. Thus, trial counsel attempted to obtain Sakahara's testimony, but circumstances and the concerns of the trial court and the Prosecution prevented them from doing so. Trial counsel cannot be held responsible for these difficulties.

Furthermore, it is not at all certain that the witnesses that trial counsel failed to obtain would have provided the testimony asserted. In *State v. Reed*, 77 Hawai'i 72, 881 P.2d 1218 (1994), we rejected an ineffective assistance of counsel claim because, other than the defendant's uncorroborated assertions, there was no evidence in the record indicating what the proffered witnesses would have testified to. *Id.* at 84, 881 P.2d at 1230. We held:

> In the absence of sworn statements from the [witnesses] verifying that, had they been called . . ., they would have testified as [defendant] claims they would, [defendant's] characterization of their potential testimony amounts to nothing more than speculation and, therefore, is insufficient to meet his burden of proving that his trial counsel's failure to subpoena the . . . witnesses constituted constitutionally ineffective assistance of counsel.

*Id.* In *State v. Aplaca*, 74 Haw. 54, 837 P.2d 1298 (1992), this court held that the failure of counsel to call certain witnesses constituted ineffective assistance of counsel; however, the record included affidavits from the various witnesses describing what they would have testified to if they had been called. *Id.* at 68–69, 837 P.2d at 1306. *See also Silva*, 75 Haw. at 442, 864 P.2d at 594 (noting the presence of a witness's post-trial affidavit in the record). In the present case, there is no indication in the record that a suitable replacement for Bernard Ching was available or what such a person would have testified to. There is also no basis in the record for inferring that Keiko Sakahara would have in fact testified that Kototome was connected to organized crime. On the contrary, the record reflects only trial counsel's uncorroborated, aspirational assertions that amount to mere speculation. Therefore, if there is no reliable indication that the testimony of an expert on organized crime or the testimony of Sakahara would have been helpful to the defense, there can be no error in failing to obtain that testimony.

It is also difficult for Defendant to establish the second prong of the ineffective assistance test, namely, that the "errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." The defense theory at trial was that Defendant became involved in the murders under threat of death, *i.e.*, that he acted under duress. HRS § 702–231 (1993) provides in relevant part:

> **Duress.** (1) It is a defense to a penal charge that the defendant engaged in the conduct or caused the result alleged because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

Duress is an affirmative defense, and the defendant has the burden of going forward with the evidence to prove facts constituting the defense and of proving such facts by a preponderance of the evidence. HRS § 702–231(5) (1993).

Even if trial counsel had presented expert testimony as to the existence of Japanese organized crime and testimony linking Kototome Fujita to organized crime, there still would not have been enough evidence to support a duress defense. There was no evidence that any member of organized crime used unlawful force or threatened to use force against Defendant. Thus, a material element of the duress defense was still missing, and duress could not have been proven by a preponderance of the evidence. The failure of trial counsel to obtain the two witnesses did not impair a potentially meritorious defense because, without evidence of unlawful force or the threat of force exercised against Defendant, Defendant never had a meritorious defense in the first place. It should also be noted that the trial court was aware of this deficiency. Defendant requested a jury instruction on the duress defense but the trial court refused to give the instruction because the evidence did not support it.

Furthermore, without evidence that members of Japanese organized crime were somehow connected to Defendant, the evidence provided by the two witnesses would have been inadmissible. In *State v. Rabellizsa*, 79 Hawai'i 347, 903 P.2d 43 (1995), this court held that "[e]vidence that a third person had

a motive to commit the crime, absent any evidence that links the third person to the commission of the crime, is irrelevant and collateral in nature." *Id.* at 351, 903 P.2d at 47. In the present case, assuming *arguendo* that the testimony of an expert on Japanese organized crime would have established that such organizations are present in Hawai'i, and further assuming that the testimony of Sakahara would have established that Kototome was connected to organized crime, the most that could be proven is that unknown members of Japanese organized crime might have had a motive to kill Kototome. However, without evidence linking Japanese organized crime to these particular incidents,[14] such as proof that members of organized crime had threatened Defendant, the testimony of the two witnesses would have been irrelevant and therefore inadmissible.[15]

In summary, Defendant has failed to establish that the performance of trial counsel was not within the range of competence demanded of attorneys in criminal cases. The evidence against Defendant was overwhelming, the trial court ruled against Defendant, witnesses lived in a far-off foreign country, and the evidence supporting Defendant was sparse. Trial counsel cannot be held responsible for these circumstances.

### 5. Judicial Misconduct Based on Contemptuous Treatment of Defense Counsel

■ Defendant argues on appeal that he was deprived of a fair trial by the trial court's demeaning remarks toward defense counsel [16] in the presence of the jury. Defendant relies on seven specific incidents in which the trial court allegedly treated counsel contemptuously.

■ In *State v. Pokini*, 55 Haw. 640, 526 P.2d 94 (1974), this court noted:

An injudicious attitude held and expressed against an attorney is likely to color the judge's approach to matters in the case entrusted to his [or her] discretion as well as to impress the jury with the idea that he [or she] disfavors the attorney and, inferentially, the position the attorney represents. So serious is the danger to a fair trial posed by a judge's unwarranted remarks demeaning defense counsel in the presence of the jury, that the law considers them errors of constitutional proportions. The constitutional rights of the defendant compromised by such conduct include the rights to due process of law, assistance of counsel in a criminal prosecution, and trial by an impartial jury.

*Id.* at 644–45, 526 P.2d at 101 (citations omitted). The question is whether the trial judge's conduct "reveal[s] a deep and thorough-going bias against and contempt for the appellants' legal representation" that is "fundamentally at odds with his [or her] judicial responsibilities." *Id.* at 647, 526 P.2d at 102. However, a conviction need not be reversed if the error is harmless beyond a reasonable doubt. *Id.* at 645, 526 P.2d at 101. "A crucial if not determinative consideration in

---

14. Defendant apparently argues that the manner in which the Fujitas were killed provides the necessary link to Japanese organized crime. Defendant asserts that the use of a single bullet through the heart and the use of fire at the scene of the crime are characteristic of an organized crime execution. However, there is nothing in the record corroborating this assertion. And even if the assertion were true, the method by which the Fujitas were killed does not seem so unique as to necessarily mean that organized crime is involved whenever it is used. One does not have to be a professional killer in order to realize that using a single gunshot, rather than many, and destroying evidence with fire, rather than leaving it to be discovered, lessen the possibility of being apprehended and convicted. Therefore, we do not believe that the manner in which the Fujitas were killed provides a sufficient link to organized crime.

15. One could argue that the failure of trial counsel to produce evidence that members of Japanese organized crime threatened Defendant was, in itself, ineffective assistance of counsel. However, such an argument overlooks the distinction between counsel's failure to submit exculpatory evidence and the non-existence of such evidence. Counsel cannot be blamed for failing to submit evidence that may not have existed in the first place. Nothing in the record indicates that such evidence, in fact, existed.

16. We note that Defendant was represented by two attorneys at trial and that the behavior of only one of those attorneys figures prominently in this section.

assessing whether a constitutional error is harmless beyond a reasonable doubt is the strength of the prosecution's case on the defendant's guilt." *Id.* (citing *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967)).

In the present case, the transcripts of the incidents cited by Defendant and the record as a whole indicate that most of the exchanges between the trial court and defense counsel occurred either at bench conferences or during recesses. Indeed, the trial court appears to have made an effort to prevent such exchanges from occurring within the hearing of the jury. Furthermore, the transcripts reveal that the exchanges were generally triggered by the conduct of defense counsel. Defense counsel consistently behaved in an unacceptable manner. He re-

fused to comply with the rulings of the court. He was disrespectful to the court, to opposing counsel, and to witnesses.[17] He argued objections in open court and before the jury without requesting to approach the bench. During conferences with the court and the other attorneys, he spoke out of turn. He continually made comments, exhibited facial expressions, and laughed in response to opposing counsel's questions and remarks. When the trial court attempted to correct his behavior, he responded by accusing the court of bias. Under these circumstances, it is understandable that the trial court occasionally used harsh language. However, on the whole, the trial court appears to have been motivated by a desire to maintain order and decorum during the proceedings rather than by any improper biases.[18]

17. The extent of defense counsel's disrespectful conduct is revealed in an exchange that occurred on March 23, 1995, during voir dire of medical examiner Dr. Kanthi De Alwis:

> [DEFENSE COUNSEL]: Doctor, is there a problem answering yes or no to my responses?
> [PROSECUTOR]: Objection, Your Honor.
> [DEFENSE COUNSEL]: Nonresponsive. Your Honor, self-serving responses to the jury. I'm asking for a yes or no response. Very simple.
> [PROSECUTOR]: Your Honor, may we approach the bench, please.
> [DEFENSE COUNSEL]: What are your trying to conduct it from.
> [PROSECUTOR]: Your Honor, may we approach the bench? I have an objection.
> THE COURT: Counsel. [Defense Counsel.] Approach the bench.
> [DEFENSE COUNSEL]: Thank you.
> (Bench Conference proceedings.)
> [PROSECUTOR]: Your Honor, the State's objection is that [Defense Counsel] is being argumentative with this witness, and he's not treating her with common courtesy. I have no problems with him asking questions per the area at issue. But for him to constantly interrupt here in the fashion that he's done at this point in time is—I think is inappropriate and does a disservice to this entire trial.
> THE COURT: The next time you're disrespectful to this witness, I will find you in contempt of court. The next time you're disrespectful to this Court, I will find you in contempt.
> [DEFENSE COUNSEL]: Excuse me. Let's put it on the record so we understand something here.
> One, I take your comments as a threat.
> THE COURT: You can take it whichever way you want.

> [DEFENSE COUNSEL]: Just for the record, you're threatening me? I will conduct myself as I see fit.
> THE COURT: You do not see fit clearly, [Defense Counsel]. I asked you continuously throughout these proceedings.
> [DEFENSE COUNSEL]: Excuse me. Can I place myself on the record without being interrupted? Thank you. You look like you're about to explode.
> THE COURT: I'm not. You're the one who's going to suffer the consequences, [Defense Counsel]. I am telling you, if you continue on like this, you force me to find you in contempt, and I will do so, [Defense Counsel].
> [DEFENSE COUNSEL]: I'm not asking you to find me in contempt, Your Honor. You see what she's doing?
> Apparently, I ask for a yes or no response to a yes or no question. Instead, she turns to the jury and starts giving these self-serving answers. I try to object to them; Counsel jumps up and starts making objections. I was still waiting for a ruling to my objection.
> THE COURT: I will rule, and you will accept my ruling as I rule them. If you don't like them, you can take it up on appeal.
> Proceed.
> (End of Bench Conference.)

18. On March 24, 1995, the trial court noted:
> THE COURT: All right.
> I will tell you that I have no time. I care not about you to have any personal animosity about you. All I care about is that who ever appears before me in a professional capacity conducts himself in that manner. And if you do not conduct yourself in a civil and respectful manner before this Court, that this Court is entitled to deal with it as it deems appropriate.
> ....
> THE COURT: And so I do not believe I have any personal animosity against you. Like I

The vast majority of the incidents cited by the parties occurred outside the presence or hearing of the jury. The two incidents that did occur within the hearing of the jury cannot be considered judicial misconduct. On April 10, 1995, after Gladys Brandt testified, the trial court made a comment that was, at most, highly ambiguous and could simply have referred to the difficult examination the witness had endured from both sides.[19] The second incident, on April 18, 1995, was triggered by defense counsel's own improper conduct. Defense counsel himself subsequently acknowledged that his behavior was improper and apologized to the court and the jury. While the trial court could have used milder language, counsel's behavior was improper by his own admission.[20]

19. The following exchange took place:

said, I don't have the time, the energy, or the interest.

Q. Okay. Thank you, Mrs. Brandt.
A. You're welcome.
[DEFENSE COUNSEL]: I have no further questions.
THE COURT: All right. Thank you, Mrs. Brandt. You're excused and you're finished. I'm sure you're very glad.
All right. We'll stand in recess for lunch and we will see you back here at 1:30 this afternoon.
THE BAILIFF: Your honor—
[DEFENSE COUNSEL]: Excuse me, your honor. Place something on the record after the jury leaves.
THE COURT: All right. Everyone will rise for the jury and, Mrs. Brandt, you're excused.
THE WITNESS: Thank you.
(The witness was excused.)
(The following proceedings were held in open court in the absence of the jury.)
[DEFENSE COUNSEL]: Your honor, your last remark, I'd ask you not to do that again. When I've completed my cross-examination, your reference to ["Y]ou must be glad,["] that points a finger at me or at the defense. Now if that reference was made to all of us or meant to all of us, that's something else. But when the jury's exiting and I'm still standing here, I just completed my cross, and you make a quip like that, that reflects negatively on my client.
THE COURT: All right. And I apologize. It wasn't meant as a quip as against the defense.
[DEFENSE COUNSEL]: Thank you, your Honor.
THE COURT: Only that the whole examination appeared to be very difficult for her.
[DEFENSE COUNSEL]: Yes, I would agree.
THE COURT: All right. We'll stand in recess to 1:30.

20. The following exchange occurred:

[DEFENSE COUNSEL]: Your Honor, I have to object before the witness completes his reply in Japanese.
THE COURT: Just state your legal objection, counsel.
[DEFENSE COUNSEL]: Counsel is now calling for hearsay.
THE COURT: Counsel?

[PROSECUTOR]: Your Honor, it's a yes or no question. I'm not going to elicit the answer.
[DEFENSE COUNSEL]: It's hearsay and leading.
THE COURT: You're not going to ask—not elicit the hearsay?
[PROSECUTOR]: Yes.
THE COURT: Overruled.
[DEFENSE COUNSEL]: May I—
THE COURT: If you wish argument you will ask to approach the bench. I don't think I need to remind you again and again like a child, do I?
[DEFENSE COUNSEL]: That last comment on the record, do not ever refer to me in front of the jury in that manner. Otherwise, I suggest we declare a mistrial. You treat me the same way you treat everyone else in the courtroom.
THE COURT: All right. Stand in recess at this time.
(Recess had at 1:55 PM.)
(Court reconvened at 2:00 PM out of the presence of the jury.)
[DEFENSE COUNSEL]: Your Honor, I apologize for that outburst.
THE COURT: Well, I'm tired of hearing apologies. I'm just trying to get this trial—
[DEFENSE COUNSEL]: I agree.
THE COURT:—moving and for us to get through this trial. If you want to delay this trial, that's fine.
[DEFENSE COUNSEL]: I really don't. I offer you my sincerest apologies. When you said that, I felt really wounded that you said that in front of the jury. I'm sorry. I think you can say I've made an effort in the last couple of days to put aside the behavior that you complained of earlier. I'm sorry, I really am.
I do want the trial to move forward. I don't want conflicts with you. Just the opposite. I would want to begin and end my day getting along with everyone in the courtroom and not to be in a conflictual situation other than cross-examination of a witness. So I apologize to you. I mean it sincerely.
THE COURT: And I mean—I'm telling you all this very sincerely, too. I'm just not going to tolerate it anymore. I've taken a lot of abuse. Other people have been taking abuse, witnesses have been taking abuse, the jurors have been taking abuse. And it's just not—I've just had it and I don't think I need to take this

Therefore, although these two incidents occurred within the hearing of the jury, they did not amount to judicial misconduct.

■ In summary, it cannot be said that the trial court in the present case made "unwarranted remarks demeaning defense counsel in the presence of the jury." *Pokini*, 55 Haw. at 644–45, 526 P.2d at 101. Because defense counsel's unacceptable conduct [21] triggered the trial court's remarks, those remarks were not "unwarranted." Most of the remarks were made outside the presence or hearing of the jury, and those that occurred within the hearing of the jury did not constitute misconduct. Additionally, even if some of the trial court's remarks were excessive, they constituted harmless error. The Prosecution's case against Defendant was so strong that any influence exerted by alleged judicial impropriety was harmless beyond a reasonable doubt.

### 6. *Accomplice Liability Jury Instructions*

Defendant was charged with one count of murder in the first degree and two counts of murder in the second degree. As to the second degree murder counts, the indictment charged that Defendant intentionally or knowingly caused the deaths of the decedents by shooting them with a handgun. On May 4, 1995, the Prosecution requested a jury instruction on accomplice liability,[22] arguing that Defendant had himself raised the issue through the testimony adduced. Defendant argued that the Prosecution had indicated that it would be proceeding only on the theory that Defendant was liable as a principal and not as an accomplice. The trial court granted the proposed instruction over Defendant's objection, and the instruction was delivered on May 5, 1995.

■ Defendant argues on appeal that the trial court erred in giving the accomplice liability instruction without prior notice. Defendant argues that, when the basis for ac-

---

kind of abuse from anyone whether I'm the sitting judge or not.

And I think it's counterproductive—

[DEFENSE COUNSEL]: Yes.

THE COURT:—to the whole progress of this trial. I think it's counterproductive to everyone.

[DEFENSE COUNSEL]: Oh, it is.

THE COURT: But I do not honestly feel that it is necessary for us to continue like this, and I assure you I do not intend to. And anytime there is any kind of an outburst, I will excuse the jury and I will take a recess. I let you know in advance of what my plans are because neither will I allow this to continue and I will not allow the jurors to be subjected to this.

[DEFENSE COUNSEL]: May I apologize to the jury when they come back in?

THE COURT: I will tell you this—you may apologize to the jury. But I tell you now in advance this is exactly what will happen. Everytime—you can be assured that everytime there is an outburst, an improper statement before the jury, any kind of nonverbal communication before the jury that I consider inappropriate, I will take a recess.

And if it means that this trial goes a month longer, so be it. But I think that you control whether or not this case progresses smoothly and in an orderly fashion or not. But I think that I have had it and I really think the jury has had it, too.

But it's not going to happen. Either we do this or you sit in jail if you—when you're all ready to—to pull yourself together and proceed with the trial.

[DEFENSE COUNSEL]: I understand. And I want to apologize to the jury, Your Honor.

. . . .

(The jury entered at 2:03 PM.)

THE COURT: All right. You may all be seated. And the record will reflect—also note the presence of the jury.

[Defense Counsel].

[DEFENSE COUNSEL]: Thank you. Ladies and gentlemen, I apologize. The Judge was right, I was wrong. That was childish.

THE COURT: All right. [Prosecutor], continue with your direct examination of this witness then.

21. Ultimately, the trial court convicted defense counsel of criminal contempt of court, in violation of HRS § 710–1077(1)(a) (1993), four times. The convictions were for incidents occurring on February 27, March 24, April 12, and April 20, 1995. He was sentenced to 24 hours imprisonment for each conviction; however, the sentences ran concurrently.

22. HRS § 702–222 (1993) provides in relevant part:

> **Liability for conduct of another; complicity.** A person is an accomplice of another person in the commission of an offense if:
> (1) With the intention of promoting or facilitating the commission of the offense, the person:
> . . . .
> (b) Aids or agrees or attempts to aid the other person in planning or committing it[.]

complice liability is not apparent from the charge or the facts of the case, an allegation of accomplice liability is required at some point during the proceedings. Defendant distinguishes this case from prior Hawai'i case law, *see State v. Albano,* 67 Haw. 398, 688 P.2d 1152 (1984); *State v. Apao,* 59 Haw. 625, 586 P.2d 250 (1978); *State v. Rullman,* 78 Hawai'i 488, 896 P.2d 944 (App.1995), by arguing that, in those cases, possible accomplice liability was apparent from the grand jury transcripts or the facts of the case. Defendant argues that, in the present case, all the information provided by the Prosecution indicated that Defendant was being prosecuted as a principal.

■ A review of the record and the relevant case law indicates that Defendant's arguments are meritless. In *Apao,* this court stated:

> The appellant also claims that because the indictment in this case did not notify him that he was being charged as a principal or accomplice he was unable to prepare a proper defense.
>
> The same argument was made in the case of *State v. Cooper,* 26 Wash.2d 405, 174 P.2d 545 (1946), where defendant appealed from a conviction of murder in the first degree. There, *the court said that the defendant was sufficiently put on notice when he was charged as a principal in the indictment, and the court did not err in instructing the jury on the theory of "aiding and abetting."* The court said that the prosecuting attorney was not bound under the statute to elect between charging the defendant as a principal or an accessory.

*Apao,* 59 Haw. at 645–46, 586 P.2d at 263 (emphasis added). Thus, "one who is charged as a principal can be convicted as an accomplice without accomplice allegations being made in the indictment." *Albano,* 67 Haw. at 405, 688 P.2d at 1157. *See also Rullman,* 78 Hawai'i at 490, 896 P.2d at 946. Nothing in *Apao, Albano,* or *Rullman* indicates that any additional notice of accomplice liability is required beyond a charge as a principal.

Furthermore, Defendant himself introduced evidence supporting possible accomplice liability. Pursuant to the defense theory that unknown persons connected to Japanese organized crime actually killed the Fujitas, the defense called two witnesses. Filemina Erickson testified that she saw a tall European man enter 1350 Ala Moana Boulevard with Kototome. Guido Giacometti testified that he saw a male Japanese national in the elevator of 1350 Ala Moana Boulevard. The description he gave did not match Defendant, but rather, allegedly matched an employee of Alii Divers. The logical response by the Prosecution to such evidence would be to argue that even if other people were involved in the murders, Defendant was at least liable as an accomplice. Thus, Defendant cannot complain that he lacked notice when it was his own defense strategy and the testimony of his own witnesses that raised the possibility of accomplice liability.

■ Defendant's claim that accomplice liability was precluded by the Prosecution's assurances is unsupported by the record. On December 23, 1994, the following occurred:

> [DEFENSE COUNSEL]: ... [W]e need to know, especially in light of the Court's not granting or not allowing us to file a bill of particulars, whether [the Prosecutor] is proceeding on a principal or accomplice liability basis. We need to know that in order to avoid surprise at trial, and possibly to avoid double jeopardy. Because I don't know whether or not if Mr. Fukusaku is acquitted here on the basis of him being a principal, whether he could be retried in Japan as an accomplice.
>
> THE COURT: [Prosecutor], your response?
>
> [PROSECUTOR]: Your Honor, this is the first time I've heard this kind of argument to support this theory. There's no legal basis for his request. He—I don't know where he's putting out this speculation of being tried in Japan for accomplice. He's being tried in Hawaii and that's all that matters here, the trial in Hawaii. And the evidence as to the trial in Hawaii, we have turned over discovery material to defense counsel. All the material that we

have we've turned over in discovery to them.

THE COURT: Including all possible related investigation reports?

[PROSECUTOR]: Well, Your Honor, we've turned over all the evidence of the investigation. The reason why I cannot say all possible—all possible evidence of who committed the crime all points to Mr. Fukusaku.

THE COURT: So do you know of any other investigation or reports pertaining to any other suspects?

[PROSECUTOR]: No.

THE COURT: All right. That being the case then, item four is denied.

Thus, the Prosecution's statements were primarily in relation to a theoretical double jeopardy problem if Defendant were to be prosecuted as an accomplice in Japan. Additionally, the Prosecution was simply stating that all the evidence *at that point* implicated Defendant. It was not until Defendant presented the testimony of Erickson and Giacometti at trial that the possibility of accomplice liability emerged. In any case, the statement cannot be regarded as a promise not to pursue a theory of accomplice liability should evidence supporting such a theory come to light in the future.

The fact that accomplice liability was not precluded in the future is apparent from the exchange that occurred immediately after the Prosecution's statements:

[DEFENSE COUNSEL]: Your Honor, in light of the Court's ruling and [the Prosecutor's] representation, *I would ask the Court at this point to make a determination that accomplice liability in this case be precluded, be precluded from arguing.* We're asking specifically for this information. [The Prosecutor] says he doesn't have it, he doesn't rely—all the

evidence points to Mr. Fukusaku, so that when we prepare for this trial, it's going to be on the basis that he is being charged and tried as a principal.

THE COURT: Well, it's not before me. *I'm not going to make that ruling.* And as I said, I disallowed the bill of particulars because it is untimely. It was submitted to this Court, what, this week, I think, and you had plenty of time to submit a bill of particulars if that is what you wished.

[DEFENSE COUNSEL]: Your Honor, you've got to remember, too, that we've just gotten these FBI report after the motions deadline. And it was based in part on that and in part on [the Prosecutor's] response at the motion to dismiss for lack of probable cause as to 1 and 2 that generated the bill.

THE COURT: Well, I—I think that in looking at—having looked at the request—motion for bill of particulars, that based on the discovery already provided to you that the bill of particulars—motion could have been filed sooner. *But the Court will not make that declaration as requested.*

(Emphases added.) Thus, the trial court twice denied the defense request to foreclose the possibility of accomplice liability. Based on this exchange, Defendant had clear notice that accomplice liability was still a possibility.

### 7. *Sentences to Mandatory Minimum Terms*

■ The trial court sentenced Defendant to two consecutive mandatory minimum terms of imprisonment of fifteen years each under HRS § 706-660.1(1) (1993).[23] Defendant argues on appeal that the imposition of the mandatory minimum terms in this case was dependent upon the existence of the aggravating circumstance of the use of a firearm. However, Defendant points out

---

**23.** HRS § 706-660.1 (1993) provides in relevant part:

**Sentence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a felony.** (1) A person convicted of a felony, where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not,

may in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without the possibility of parole or probation the length of which shall be as follows:
(a) For murder in the second degree and attempted murder in the second degree—up to fifteen years[.]

that the trial court instructed the jury on accomplice liability. Defendant argues that, because the verdicts rendered by the jury were general verdicts and did not specify the basis for the finding of guilt, it cannot be determined whether Defendant was convicted as a principal who actually shot the Fujitas with a handgun or as an accomplice who aided the commission of the crime but never touched a gun. Defendant cites *Garringer v. State*, 80 Hawai'i 327, 909 P.2d 1142 (1996), and argues that it is dispositive. In *Garringer*, the defendant was convicted of robbery in the first degree along with several firearm offenses. *Id.* at 329, 909 P.2d at 1144. Garringer committed the robbery with a code-fendant—a minor who was armed with a shotgun. Garringer argued, *inter alia*, that he could not be sentenced to a mandatory minimum term because he never actually possessed the shotgun during the robbery. *Id.* at 330, 909 P.2d at 1145. This court held that "HRS § 706–660.1(1) must be interpreted, absent definitive legislative history to the contrary, to preclude the imposition of enhanced sentencing with respect to [a defendant's conviction] where he did not personally possess, threaten to use, or use a firearm while engaged in the commission of that felony." *Id.* at 333–34, 909 P.2d at 1148–49. Defendant argues that the possibility that the verdict in the present case was based on accomplice liability requires either that the mandatory minimum term be vacated or the case retried.

The Prosecution argues that the trial court specifically instructed the jury that, to find Defendant guilty, it had to find that Defendant caused the death of Goro and/or Koto-tome "by shooting [him/her] with a handgun." The Prosecution argues: "Thus, the jury was expressly instructed that it must find that, even acting as an accomplice, Defendant must have done so by shooting the Fujitas. Under the instructions given, it would not have sufficed if the Defendant did some other act such as luring the victims to his apartment or arranging to dispose of the body."

We reject the Prosecution's argument for two reasons. First, the Prosecution's argument is, on its face, self-contradictory. By definition, a principal is "the one who actually commits a crime." *Black's Law Dictionary* 1192 (6th ed.1990) (definition of principal in the first degree). An accomplice is a person who aids or assists the principal in planning or committing the crime. *Id.* at 17; *see also supra* note 22. In the present case, if Defendant actually shot the Fujitas, then he would be the principal and not an accomplice. The Prosecution's statement that Defendant could have been an accomplice "by shooting the Fujitas" is nonsensical. Second, the Prosecution is correct in that the instructions given to the jury regarding the charged offenses required a finding that Defendant shot the Fujitas with a handgun. However, the Prosecution conveniently overlooks the fact that a separate accomplice liability instruction was also given. That instruction stated that Defendant would be liable as an accomplice "if, with intent to promote or facilitate the commission of the offense, he aid[ed] or agree[d] or attempt[ed] to aid the other person in planning or commission of the offense." Thus, Defendant could have been convicted as an accomplice based on aiding the principal in some way, even without using a firearm. For example, he could have lured Goro to his apartment, supplied the actual killer with the murder weapon, helped subdue or restrain the Fujitas, or assisted in planning the homicides by agreeing to dispose of the bodies.

In our view, *Garringer* directly controls the present case. Under *Garringer*, a mandatory minimum sentence is improper if the defendant was simply an accomplice and not the principal who used the firearm. The evidence presented at trial certainly supports the theory that Defendant acted as the principal; however, the evidence also supports the theory that Defendant may have been an accomplice. For example, the testimony of Filemina Erickson and Guido Giacometti supports the inference that persons other than Defendant may have been involved in the murders as well. Thus, although the evidence strongly indicates that Defendant was present at both apartments and was involved in the murders, he could have been involved as either a principal or an accomplice. Throughout the trial, the defense theory was that Defendant did not shoot the Fujitas and

that someone else did. Most importantly, the trial court delivered an accomplice liability jury instruction that accorded the jury the option of convicting Defendant as an accomplice. For these reasons, the jury could very well have decided that Defendant was criminally responsible as an accomplice rather than as a principal. Inasmuch as the verdicts were general verdicts that failed to reveal whether Defendant was found guilty as a principal or an accomplice, it is impossible to determine from the record, at this time, whether the jury found that Defendant was the principal who killed the Fujitas with a firearm or that he was an accomplice who aided the commission of the crime in some other way. Because of this uncertainty, Defendant's mandatory minimum sentences must be vacated.[24]

24. Although Defendant's mandatory minimum sentences must be vacated, we need not vacate his convictions. We distinguish the situation in the present case from that in *State v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996). In *Arceo*, the defendant was charged with one count of sexual assault in the third degree and one count of sexual assault in the first degree, for acts occurring between August 16, 1989 and May 4, 1990. The complaining witness alleged two specific acts of sexual contact and five specific acts of sexual penetration as the bases for the charges. The defendant was convicted of both counts and appealed. This court vacated the defendant's convictions on the grounds that

> when separate and distinct culpable acts are subsumed within a single count charging a sexual assault—any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, *i.e.*, an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Id.* at 32–33, 928 P.2d at 874–75.

The present case, however, involves an accomplice liability situation. Cases from other jurisdictions have refused to require specific unanimity instructions in accomplice liability situations. These cases, like *Arceo*, recognize that the right to a unanimous verdict requires a specific unanimity instruction when two or more incidents can support a guilty verdict for a particular offense. However, an accomplice liability situation does not involve two or more incidents; rather, it involves two or more persons who participate in a single incident. The Delaware Supreme Court held: "The need for a specific unanimity instruction flows from the fact that the basis for liability stems from two separate incidents and not from the applicability of principal or accomplice liability with respect to one of the two incidents." *Pope v. State*, 632 A.2d 73, 79 (Del.1993) (quoting *Probst v. State*, 547 A.2d 114, 123 (Del.1988)). The court stated that "[t]here is no requirement ... that the jury be unanimous in its view as to which of the parties was the principal and which was the accomplice." *Id.* "The 'particular set of facts' as to which the jury was required to agree unanimously was the incident or act to which the State attributed criminal liability, and not the role of the actors as principal or accomplice." *Id.* "[A] specific unanimity instruction is not required where a single defendant may be convicted as either a principal or an accomplice." *Id. See also People v. Forbes*, 175 Cal.App.3d 807, 221 Cal.Rptr. 275 (1985); *Dixon v. State*, 673 A.2d 1220 (Del.1996); *Commonwealth v. Ramos*, 31 Mass.App.Ct. 362, 577 N.E.2d 1012, *review denied*, 411 Mass. 1103, 581 N.E.2d 481 (1991); *State v. Esker*, 658 S.W.2d 49 (Mo.Ct.App.1983); *State v. Bockman*, 37 Wash. App. 474, 682 P.2d 925, *review denied*, 102 Wash.2d 1002 (1984). Therefore, a specific unanimity instruction is not required in accomplice liability situations.

In *Arceo*, evidence of seven specific incidents of sexual abuse was produced, and the problem was determining which incidents provided the bases for the two offenses charged. Thus, multiple alternative incidents were used to support each offense. The present case, however, involves a single incident with respect to each offense. One incident was the killing of Goro Fujita, and another incident was the killing of Kototome Fujita. Each incident separately supported a different count of second degree murder. The possibility of accomplice liability simply means that two or more persons could have been involved in each incident. Thus, the present case is distinguishable from *Arceo*. Moreover, it is well settled, under Hawai'i law, that "[d]istinctions between principals and accessories are dispensed with and a defendant may be convicted directly of an offense committed by another for whose conduct he is accountable." *State v. Apao*, 59 Haw. 625, 644, 586 P.2d 250, 262 (1978) (quoting the Commentary on HRS § 702-221). Therefore, specific unanimity instructions were not required in the present case.

Additionally, the Prosecution was not required to elect between principal liability and accomplice liability. In *Apao*, this court cited a Washington state case for the proposition that "the prosecuting attorney [is] not bound ... to elect between charging the defendant as a principal or an accessory." *Id.* at 646, 586 P.2d at 263 (citing *State v. Cooper*, 26 Wash.2d 405, 174 P.2d 545 (1946)).

In summary, *Arceo* does not apply to the present case. Cases from other jurisdictions hold

We also note that, at oral argument, the Prosecution conceded that *Garringer* calls the validity of the mandatory minimum sentences into question.

■ *Garringer* further states that, "[o]n remand, the sentencing court is not empowered to make the necessary findings that [defendant] actually or constructively possessed the [firearm] during the [offenses]." *Garringer*, 80 Hawai'i at 334, 909 P.2d at 1149 (citing *State v. Schroeder*, 76 Hawai'i 517, 528, 880 P.2d 192, 203 (1994) (where the aggravating circumstances required under an enhanced sentencing statute are *intrinsic* to the commission of the crime charged, they must be determined by the trier of fact)). Therefore, the proper procedure, as described in *Garringer*, is to withhold judgment on Defendant's convictions for thirty days. *See id.* (citing *United States v. Garcia*, 37 F.3d 1359, 1370–71 (9th Cir.1994), *cert. denied*, 514 U.S. 1067, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995)). If the Prosecution, within that time, consents to resentencing without mandatory minimum terms under HRS § 706–660.1, we will affirm the convictions and remand for resentencing. *See id.* at 334–35, 909 P.2d at 1149–50. If, on the other hand, the Prosecution does not consent, we will vacate the convictions and remand for retrial. *See id.* at 335, 909 P.2d at 1150. On retrial, the trial court is to instruct the jury, by special verdict interrogatories, to make any and all findings relevant to the imposition of enhanced sentences. *See id.*

### B. *Prosecution's Cross–Appeal*

Our disposition of Defendant's appeal based on *Garringer* means that the ultimate outcome of this case depends on the decision the Prosecution makes within thirty days. The choice the Prosecution makes will also have an impact on the issues raised in the Prosecution's cross-appeal. On the one hand, if the Prosecution consents to resentencing without the mandatory minimum terms and the convictions are affirmed, then the issues raised in the cross-appeal become moot. *See State v. Okuda*, 71 Haw. 434, 456, 795 P.2d 1, 13 (dismissing the prosecution's cross-appeal because the issues were rendered moot by the court's decision not to remand for retrial), *reconsideration denied*, 71 Haw. 665, 833 P.2d 900 (1990). If the convictions are affirmed, the Prosecution will have received its requested remedy—conviction of the Defendant. Because there would no longer be an outstanding remedy, the entire cross-appeal would be moot. *See AIG Hawai'i Ins. Co., Inc. v. Bateman*, 82 Hawai'i 453, 458–59, 923 P.2d 395, 400–01 (1996). On the other hand, if the Prosecution does not consent to resentencing and the convictions are vacated, the Prosecution would no longer have its remedy. The case would then have to be retried and the remedy—conviction—would not have been achieved. Thus, the issues in the cross-appeal would not be moot. Because we are following the procedure described in *Garringer*, we have no way of knowing, at this point, whether the convictions will be affirmed or vacated. Consequently, we are forced to address the issues in the cross-appeal due to the possibility that the Prosecution will refuse consent and choose to retry Defendant.

■ However, before addressing the merits of each issue in the cross-appeal, we must first examine the threshold question of whether the Prosecution has the statutory right to appeal the issues raised. "The right of appeal in a criminal case is purely statutory and exists only when given by some constitutional or statutory provision." *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73, *reconsideration denied*, 78 Hawai'i 474, 896 P.2d 930 (1995). "The Prosecution's right of appeal in criminal cases is limited to those instances set forth in HRS § 641–13[.]" *Id.* Subsection (5) of that statute provides that the Prosecution may appeal "[f]rom a ruling on a question of law adverse to the State where the defendant is convicted and appeals

---

that specific unanimity instructions are not required in accomplice liability situations. Under *Apao*, the prosecution is not required to elect between principal liability and accomplice liability. The trial court delivered a general unanimity instruction, and that instruction was sufficient to protect Defendant's constitutional right to a unanimous verdict. So although we must vacate the mandatory minimum sentences under *Garringer*, we need not vacate the convictions under *Arceo*.

from the judgment." HRS § 641–13(5) (1993). Thus, a preliminary question that must be addressed is whether the four issues raised in the cross-appeal involve "questions of law." Defendant argues that the term "question of law" must be narrowly interpreted as applying only to issues subject to a *de novo* or right/wrong standard of review. The Prosecution, however, argues in favor of a broader interpretation not limited by the standard of review.

▪ In our view, the language of the statute is ambiguous; the term "question of law" can legitimately be read narrowly or broadly. Therefore, it is subject to two possible meanings and is ambiguous. *See State v. Toyomura,* 80 Hawai'i 8, 19, 904 P.2d 893, 904 (1995) ("[A] statute is ambiguous if it is 'capable of being understood by reasonably well-informed people in two or more different senses.'"). When a statute is ambiguous, we may resort to legislative history as an interpretive tool. *Id.*

The Senate Judiciary Committee report on the original version of HRS § 641–13, *see* 1911 Haw. Sess. L. Act 40, § 1 at 37, states:

There are many good reasons why a decision in favor of a defendant in a criminal case upon a question of fact, or on the guilt or innocence of the defendant should not be reviewed, but there is no good reason why a person charged with crime should be permitted to escape simply because the trial judge has erred on a pure question of law.

Sen. Stand. Comm. Rep. No. 86, in 1911 Senate Journal, at 309–10. *See also Wells,* 78 Hawai'i at 377, 894 P.2d at 74. Although this committee report discusses questions of fact and questions of law, it does not expressly refer to standards of review, such as the clearly erroneous standard or the *de novo* standard. Moreover, it does not even implicitly consider the abuse of discretion standard or the no substantial evidence standard. Thus, we believe that the legislature was not specifically referring to standards of review when it used the term "question of law" in HRS § 641–13. On the contrary, we believe

that the legislature was using the term in another, less technical, sense. In *State v. Kelekolio,* 74 Haw. 479, 849 P.2d 58 (1993), we noted the following:

"That the jury is to pass upon the facts and the [c]ourt upon the law[ ] is a principle which lies at the foundation of jury trial in every country blessed with [that] institution[.]" *Lewis v. Davis,* 1 Haw. 248, 249 (1854). Correlatively, the admissibility of evidence is a question of law for the trial judge to determine. *Territory v. Buick,* 27 Haw. 28, 52 (1923); *see also* HRE 104(a) (1985) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court"). On the other hand, "[t]he jury, as the trier of fact, is the sole judge of the credibility of witnesses [and] the weight of the evidence." *State v. Tamura,* 63 Haw. 636, 637–38, 633 P.2d 1115, 1117 (1981) (citations omitted); *State v. Summers,* 62 Haw. 325, 332, 614 P.2d 925, 930 (1980) (citations omitted).

*Id.* at 515–16, 849 P.2d at 75 (alterations in original)(footnote omitted). Thus, in *Kelekolio,* we discussed issues of law and fact in relation to the relative roles of judge and jury. Issues involving law, such as the admissibility of evidence, are decided by the judge; while issues involving fact, such as the credibility of witnesses, the weight accorded the evidence, and the ultimate factual guilt of the defendant, are decided by the jury. We believe that the legislature had this distinction in mind, rather than standards of review, when it used the term "question of law" in HRS § 641–13. We therefore hold that, in a jury trial, issues decided by the judge are "questions of law" appealable under HRS § 641–13, while issues decided by the jury are "questions of fact" and are not appealable.[25]

Other portions of the legislative history of HRS § 641–13 support our interpretation. When the original statute was amended in 1931 to add the provision now located in subsection (5), *see* 1931 Haw. Sess. L. Act 37, § 2 at 28–29, the Senate Judiciary Committee stated:

**25.** We note, however, that in a jury-waived or bench trial, the judge acts as the trier of fact instead of a jury. Thus, issues that the judge

decides in his/her capacity as trier of fact are not "questions of law" and are not appealable.

The Bill also proposes to *amend the present law by granting to the Territory greater leeway in taking up questions in criminal cases for review upon writ of error.* The law now limits these in large part to cases in which the judgment of the lower court is based on the invalidity or construction of the statute upon which the charge is founded. Your Committee believes that *the more questions that may be settled in this manner will promote the more efficient enforcement of the criminal laws.*

Sen. Stand. Comm. Rep. No. 151, in 1931 Senate Journal, at 572 (emphases added). Thus, one purpose of adding subsection (5) was to promote efficiency. Our interpretation of the term "question of law" will allow this court to address more issues than under the narrow interpretation advocated by Defendant. This means that we will be able to correct a greater number of errors by trial courts while the cases are before us instead of allowing errors to remain uncorrected and perhaps repeated on retrial. We believe that immediately correcting errors is more efficient than allowing them to be perpetuated. Thus, our approach is more consistent with the purpose of the 1931 amendment that added subsection (5).

 Defendant argues that this court has long held that HRS § 641–13 must be strictly construed:

> The availability of appellate review sought by the State in a criminal case can be based only on clear statutory authority. This court has held that the statute must be strictly construed and that it cannot extend beyond the plain meaning of the terms found therein.

*State v. Bikle,* 60 Haw. 576, 578–79, 592 P.2d 832, 834 (1979) (quoting *State v. Johnson,* 50 Haw. 525, 526, 445 P.2d 36, 37 (1968)). However, this strict construction rule, like the rule applicable to penal statutes generally, does not permit the court to ignore legislative intent in the face of statutory ambiguity, nor require the court to reject the construction that best harmonizes with the design of the statute or the end sought to be achieved. *See State v. Gaylord,* 78 Hawai'i 127, 138–39, 890 P.2d 1167, 1178–79 (1995); *State v. Ortiz,*

74 Haw. 343, 352, 845 P.2d 547, 552, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993). In the present case, the legislative history of HRS § 641–13, as well as the purpose of the 1931 amendment, support our interpretation.

 Therefore, issues decided by the trial judge are "questions of law" appealable under HRS § 641–13, while issues decided by the jury are "questions of fact" and are not appealable. The four issues raised in the Prosecution's cross-appeal are all issues decided by the trial judge. The first issue involves discovery. Under HRPP Rule 16, the trial court has the power to grant protective orders, conduct *in camera* proceedings, issue orders compelling discovery, and impose monetary sanctions. Thus, the supervision and management of discovery is the responsibility of the judge and, therefore, entails a "question of law." The exclusion of the luminol and phenolphthalein test results and the exclusion of the evidence relating to Defendant's use of Goro's credit card both involve the admission of evidence. The admission of evidence is a preliminary question determined by the judge. HRE Rule 104(a). Thus, the second and third issues involve "questions of law." Finally, the allegedly discriminatory use of peremptory challenges must, necessarily, be resolved by a decision of the judge. Peremptory challenges are exercised during jury selection. Because the issue involves the formation of the jury itself, the jury can have no role in deciding the issue. Thus, the fourth issue on cross-appeal is a "question of law" as well. The Prosecution has the right to appeal all four issues raised in its cross-appeal.

### 1. *Propriety of Discovery Orders*

On September 12, 1994, the trial court entered its findings of fact, conclusions of law, and order granting in part and denying in part Defendant's motion to compel discovery. The trial court ordered the Prosecution, *inter alia,* to use "due diligence" to obtain reports "from the FBI, California law enforcement agencies, and any other law enforcement agency," to produce "[a]ll rough notes of investigators in existence as of today's hearing," and to use "due diligence" to

obtain extradition documents from the Japanese government. Subsequently, on February 21, 1995, the trial court ordered the Prosecution to make a direct request to Japanese officials for the extradition documents. On February 27, 1995, the trial court ordered the Prosecution to provide daily updates to the trial court regarding the status of the extradition documents. On March 6, 1995, the trial court ordered the Prosecution to produce all documents relating to the case, including notes, from all the Prosecution's witnesses, including civilian witnesses.

■ In its cross-appeal, the Prosecution argues that all of the above orders were improper because they exceeded the scope of discovery authorized by HRPP Rule 16. Defendant argues, *inter alia*, that the orders were not contrary to HRPP Rule 16.[26] We consider each of the discovery orders in turn. "The scope of discovery is reviewed for an abuse of discretion." *State v. Estrada*, 69 Haw. 204, 216, 738 P.2d 812, 821 (1987).

■ We first address the order requiring the Prosecution to produce "[a]ll rough notes of investigators[.]" HRPP Rule 16 provides in relevant part:

**(b) Disclosure by the Prosecution.**

(1) *Disclosure of Matters Within Prosecution's Possession.* The prosecutor shall disclose to the defendant or the defendant's attorney the following material and information within the prosecutor's possession or control:

(i) the names and last known addresses of persons whom the prosecutor intends to call as witnesses in the presentation of the evidence in chief, together with their relevant written or recorded statements, provided that statements recorded by the prosecutor shall not be subject to disclosure[.]

Thus, the rough notes of investigators are discoverable under HRPP Rule 16(b)(1)(i) only if they qualify as "relevant written or recorded statements" of "persons whom the prosecutor intends to call as witnesses."

The meaning of "statement" has been a somewhat controversial issue. HRPP Rule 16 was derived substantially from the ABA Standards Relating to Discovery and Procedure Before Trial. Note to Rule 16, Proposed HRPP, at 128 (1975). The ABA Standards did not expressly define "statement" because of a disagreement among the committee members as to what definition to adopt. *See* American Bar Association Project on Minimum Standards for Criminal Justice, *Standards Relating to Discovery and Procedure Before Trial*, Commentary to § 2.1, at 62–63 (Approved Draft 1970). The minority favored the restrictive definition of "statement" found in the federal Jencks Act, 18 U.S.C. § 3500(e),[27] on the ground that it would be grossly unfair to allow an attorney to confront a witness on cross-examination with reports of his utterances that were nei-

---

**26.** Defendant also argues that the discovery issue is both moot and untimely. Defendant argues that the issue is moot because the parties have already produced the discovery materials and it is impossible to erase the knowledge gained from those materials; therefore, the Prosecution has no remedy. However, should this case be remanded for retrial, additional discovery material may come to light. Inasmuch as HRPP Rule 16(e)(2) imposes a continuing duty to disclose, the Prosecution would be obligated to obey the trial court's previous discovery orders and produce the additional material. Thus, the Prosecution's remedy would be an implicit instruction to the trial court and the parties that the additional material is not discoverable. Because a remedy exists, the discovery issue is not moot.

Defendant's argument that the discovery issue is untimely is based on the assumption that the discovery orders were immediately appealable and that the Prosecution should not have waited until after judgment to appeal. However, in *State ex rel. Marsland v. Ames*, 71 Haw. 304, 788 P.2d 1281 (1990), we held that the prosecution has no right to appeal discovery orders before trial; if the prosecution wishes to challenge a discovery order before trial, it must apply for a writ of mandamus. Thus, the discovery issue in the present case was not untimely because the Prosecution could not have immediately appealed the discovery orders.

**27.** Under 18 U.S.C. § 3500(e) (1994), a "statement" is defined, in relevant part, as follows:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement[.]

ther substantially his own words nor approved or adopted by him. *Id.*, 849 P.2d at 62. The majority, however, felt that the defense should have the benefit of written and recorded statements of prospective witnesses in whatever form the statements have been preserved. *Id.* The 1975 proposed draft of HRPP Rule 16 followed the example of the ABA Standards and did not expressly define "statement," preferring instead to leave the matter to be developed by case law. Note to Rule 16, Proposed HRPP, at 130 (1975). Nevertheless, when the HRPP were finally adopted in October 1976 (becoming effective on January 1, 1977), Rule 16 contained an express definition of "statement" that was virtually identical to the definition in 18 U.S.C. § 3500(e). That definition remains in the current version of HRPP Rule 16 and provides:

> [ (b) ](3) *Definition.* The term "statement" as used in subsection (b)(1)(i) . . . of this rule means:
>
> (i) a written statement made by the witness and signed or otherwise adopted or approved by the witness; or
>
> (ii) a stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by the witness and recorded contemporaneously with the making of such oral statement.

Thus, HRPP Rule 16 has apparently adopted the restrictive definition of "statement" found in 18 U.S.C. § 3500(e), and we may look to federal case law in applying that definition.[28]

Federal case law indicates that the notes of investigators are subject to production only if they qualify as a "statement." In other words, the notes must be either a written statement that has been signed or otherwise adopted or approved, or they must be a substantially verbatim recital of an oral statement that has been contemporaneously recorded. *See United States v. Michaels,* 796 F.2d 1112, 1116–17 (9th Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987); *United States v. Fried-*

*man,* 593 F.2d 109, 120 (9th Cir.1979); *United States v. Johnson,* 521 F.2d 1318, 1319 (9th Cir.1975); *Hill v. United States,* 401 F.2d 995, 996 (9th Cir.1968); *Ogden v. United States,* 303 F.2d 724, 736 (9th Cir.1962).

In the present case, however, the trial court ordered the production of *all* rough notes of investigators. Inasmuch as the trial court failed to distinguish notes that qualify as a "statement" from notes that do not, the order was too broad. But more importantly, the order included *rough* notes. Under most circumstances, *rough* notes do not qualify as "statements" subject to production. *See United States v. Augenblick,* 393 U.S. 348, 354–55, 89 S.Ct. 528, 532–33, 21 L.Ed.2d 537 (1969); *United States v. Ramos,* 27 F.3d 65, 69–70 (3d Cir.1994); *United States v. Griffin,* 659 F.2d 932, 937 (9th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2019, 72 L.Ed.2d 473 (1982). Generally, the problem is that because the notes are "rough," they do not constitute a substantially verbatim recital of the witness's statement. *See United States v. Scriber,* 499 F.2d 1041, 1048 (D.C.Cir. 1974); *United States v. Stephens,* 492 F.2d 1367, 1377 (6th Cir.), *cert. denied,* 419 U.S. 852, 874, 95 S.Ct. 93, 136, 42 L.Ed.2d 83, 114 (1974). Consequently, the trial court's order was overly broad and constituted an abuse of discretion.

▪ The order to use due diligence to obtain reports from the FBI, California law enforcement agencies, and any other law enforcement agency, as well as all of the orders relating to the extradition documents from Japan, were improper for the reasons discussed in part II.A.3., *supra.* Pursuant to HRPP Rule 16(b)(2), in order to be discoverable, documents not in the possession or control of the prosecution must be in the possession or control of other state agencies. Inasmuch as Japanese government agencies, the FBI, and California law enforcement agencies clearly are not agencies of the State .of Hawai'i or its subdivisions, the orders were improper. Furthermore, the order to produce reports from "any other law enforce-

---

**28.** We note that the predecessor to the HRPP, the Hawai'i Rules of Criminal Procedure (HRCrP), incorporated the restrictive definition of "statement" in HRCrP Rule 17. In *State v.* *Maluia,* 56 Haw. 428, 539 P.2d 1200 (1975), we held that the longhand notes of a police detective were not a "statement" under HRCrP Rule 17 and were not subject to production.

ment agency" was valid only to the extent it applied to agencies of the State of Hawai'i or its subdivisions. Therefore, the trial court abused its discretion in issuing these orders.

The order to produce all documents relating to the case, including notes, from all the Prosecution's witnesses, including civilians, was improper for two reasons. First, the order failed to distinguish documents that were discoverable under HRPP Rule 16 from documents that were not discoverable. As discussed *supra,* to be discoverable under HRPP Rule 16(b)(1)(i), a document must qualify as a statement under HRPP Rule 16(b)(3). Not all notes are discoverable, and rough notes are likely not to be discoverable. Second, HRPP Rule 16 only requires that the prosecution produce documents that are either in its possession or control or in the possession or control of other state agencies. If the documents are not in the possession or control of the prosecution itself or other state agencies, the prosecution is not required to produce them. The trial court's order included documents held by all of the Prosecution's witnesses, without distinguishing whether they were agents or employees of state agencies or private citizens. For these reasons, the trial court's order was too broad and, therefore, an abuse of discretion.

■ Defendant argues that the orders requiring production of notes were valid because the notes were discoverable as written statements of expert witnesses. We disagree. HRPP Rule 16(b)(1)(iii) provides:

[The prosecutor shall disclose] any reports or statements of experts, which were made in connection with the particular case or which the prosecutor intends to introduce, or which are material to the preparation of the defense and are specifically designated in writing by defense counsel, including results of physical or mental examinations and of scientific tests, experiments, or comparisons[.]

Significantly, Federal Rules of Criminal Procedure (FRCrimP) Rule 16(a)(1)(D) also authorizes discovery of "results or reports" of physical or mental examinations and scientific tests or experiments. In *United States v. Iglesias,* 881 F.2d 1519 (9th Cir.1989), *cert.*

*denied,* 493 U.S. 1088, 110 S.Ct. 1154, 107 L.Ed.2d 1057 (1990), the Ninth Circuit held:

Looking again at the operative wording of [FRCrimP] Rule 16(a)(1)(D): the defendant is entitled to "any *results* or *reports* . . . of scientific experiments" (emphasis added). If the requested documents are either "results" or "reports," then [defendant] is entitled to the discovery. It is perhaps not immediately obvious whether the internal log notes are in fact "results" or "reports."

The definition of the term "report" is "[a]n official or formal statement of facts or proceedings." *Black's Law Dictionary* 1464 (4th ed.1968). The definition of "result" is "the conclusion or end to which any course or condition of thing leads." *Id.* at 1478. Certainly, the lab report . . . is clearly a "report" or a "result" and thus does fall within the meaning of Rule 16(a)(1)(D).

But the requested log notes do not have the requisite formality or finality to be considered as either a "report" or "result."
. . .

. . . While we certainly respect defendants' right to inspect and copy the actual results or reports of scientific tests, we are not willing to force the government to disclose every single piece of paper that is generated internally in conjunction with such tests.

*Id.* at 1523–24 (footnote omitted). *See also United States v. Dennison,* 937 F.2d 559, 565–66 (10th Cir.1991), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992). Thus, even if we assume *arguendo* that the trial court's orders were based on HRPP Rule 16(b)(1)(iii), the notes of expert witnesses are not discoverable. Consequently, the trial court abused its discretion.

Defendant also relies on *United States v. Paternina–Vergara,* 749 F.2d 993, 998 (2d Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985), for the proposition that production of foreign documents is authorized where there have been cooperative efforts between the prosecution and the foreign government. However, other federal courts have refused to allow discovery of documents held by foreign govern-

ments. *See Friedman*, 593 F.2d at 119–20. Furthermore, the notes accompanying Proposed HRPP Rule 16 clearly indicate that HRPP Rule 16(b)(2) only applies to documents held by other agencies of the State of Hawai'i or its subdivisions. Therefore, we decline to follow *Paternina–Vergara* in this case.[29]

### 2. Exclusion of Luminol and Phenolphthalein Test Results

■ By motion filed on March 10, 1995, the Prosecution sought to introduce expert testimony on luminol and phenolphthalein test results. Defendant opposed the motion. At a subsequent hearing, Mary Wagner, an HPD evidence specialist, explained that luminol and phenolphthalein are used as presumptive tests in the field to identify potential blood stains. However, she also testified that the two tests can generate false positive reactions. The tests can react to metal surfaces, cleansers containing iron-based substances, horseradish, and rust. Neither test can distinguish between animal blood and human blood, and they cannot determine how long the substance has been at the scene. When a positive reaction occurs, a criminalist must do a confirmatory test in order to conclusively determine that the test sample is human blood. Wagner stated that she tested various locations in Defendant's apartment with both luminol and phenolphthalein and that some of those sites tested positive.

The trial court ultimately excluded expert testimony on the luminol and phenolphthalein test results. The trial court ruled that, because of the limitations of the tests, the presumption of the presence of blood was relevant only to the extent that it could be supported by confirmatory tests. Moreover, the trial court ruled that, without confirmatory tests, the prejudicial effect of the evidence was not outweighed by its probative value. Inasmuch as confirmatory tests were not conducted, the trial court excluded the evidence.

On April 6, 1995, defense counsel elicited testimony from Wagner that no blood was found on any of the cushions in Defendant's apartment. The Prosecution subsequently asked the trial court to reconsider its exclusion of luminol and phenolphthalein results on the grounds that, by eliciting testimony as to test results on the cushions, defense counsel had "opened the door." Defense counsel argued that the trial court had only excluded positive test results, not negative test results. The trial court ruled that its prior order only applied to positive test results and that defense counsel had not violated that order.

In its cross-appeal, the Prosecution argues that the test results were relevant and should have been admitted. Furthermore, the Prosecution argues that confirmatory tests were in fact conducted on evidence found in the apartment—DNA tests indicated that a scrap of paper found in the apartment contained a blood spot that matched Goro's blood. The Prosecution also argues that the trial court erred in ruling that defense counsel had not "opened the door" to evidence of positive test results.

■ As discussed in part II.A.1., *supra*, we apply a two-pronged analysis in addressing proposed expert testimony. The testimony must be both relevant and reliable. *State v. Samonte*, 83 Hawai'i 507, 533, 928 P.2d 1, 27 (1996); *State v. Maelega*, 80 Hawai'i 172, 181, 907 P.2d 758, 767 (1995). Furthermore, the trial court must balance the probative value of the evidence against its prejudicial effect. *Maelega*, 80 Hawai'i at 181, 907 P.2d at 767; *see also* HRE Rule 403. The admission of expert testimony is reviewed under the abuse of discretion standard. *Maelega*, 80 Hawai'i at 180, 907 P.2d at 766.

We believe that the trial court did not abuse its discretion in excluding the expert testimony. The trial court apparently ruled that the luminol and phenolphthalein test results failed the relevancy prong of the analysis, but that, even if they did not, the test

29. The parties suggest that the challenged discovery orders may also be analyzed as sanction orders under HRPP Rule 16(e)(9). We disagree. The central question here is whether the orders of the trial court exceeded the scope of discovery authorized by HRPP Rule 16. Thus, we are addressing the initial scope of discovery, not whether the sanctions imposed after violations have occurred are "just under the circumstances." HRPP Rule 16(e)(9)(i).

results were more prejudicial than proba-tive.[30] Wagner testified that luminol and phenolphthalein tests are subject to false positive reactions and that confirmatory tests must be conducted to conclusively establish the presence of human blood. Confirmatory tests were not conducted on the sites in the apartment. Thus, the record more than ade-quately supports the trial court's ruling. Therefore, we cannot say that the trial court abused its discretion in excluding expert tes-timony on the test results.

■ We disagree with the Prosecution's assertion that the DNA tests performed on the scrap of paper found in the apartment constitute confirmatory testing sufficient to render the test results admissible. Confir-matory tests can only provide confirmation for the piece of evidence tested. Thus, the DNA tests performed on the scrap of paper cannot provide confirmation for the other sites in the apartment that were not tested.

■ We also disagree with the Prose-cution's contention that defense counsel "opened the door" to admission of the test results. Although the Prosecution cites no authority, its argument appears to be based on the doctrine of "curative admissibility," also known as "opening the door" or "fight-ing fire with fire." Under this doctrine, when one party introduces inadmissible evi-dence, the opposing party may respond by introducing his own inadmissible evidence on the same issue. *See United States v. Kessi,* 868 F.2d 1097, 1108 (9th Cir.1989); *United States v. Thompson,* 465 F.2d 583, 585 (D.C.Cir.1972); *Vine St. Corp. v. City of Council Bluffs,* 220 N.W.2d 860, 864 (Iowa 1974); *McCormick on Evidence* § 57, at 83–84 (4th ed.1992); 1 *Wigmore on Evidence* § 15, at 731–51 (1983). We note that this doctrine is subject to abuse and that most jurisdictions have limited its use to situations in which the originally submitted evidence creates significant prejudice. *Wigmore on Evidence* § 15, at 741–42 & n.6. The Prosecu-tion apparently argues that the luminol and phenolphthalein test results were rendered inadmissible by the trial court's exclusion order. When defense counsel elicited testi-mony as to negative test results, he intro-duced inadmissible evidence and "opened the door" to the admission of positive test results in rebuttal. However, in her testimony, Wagner discussed only the danger of false *positives,* not false *negatives.* Thus, the trial court's exclusion order was implicitly con-fined to evidence of positive test results and did not include negative test results. Conse-quently, evidence of negative test results re-mained admissible. When defense counsel elicited testimony regarding negative test re-sults, he introduced *admissible* evidence, not *inadmissible* evidence. Therefore, even if we were to adopt the doctrine of curative admissibility, it would not be applicable to the present case. *See United States v. Brown,* 921 F.2d 1304, 1307 (D.C.Cir.1990) (holding that defense counsel did not "open the door" because the testimony elicited was not inadmissible).

Therefore, in summary, the trial court did not abuse its discretion in excluding expert testimony on the luminol and phenolphtha-lein test results.

### 3. *Exclusion of Defendant's Use of Goro Fujita's Credit Card*

■ On December 16, 1994, Defendant filed his motion in limine number 20, seeking to exclude evidence of Defendant's alleged use of Goro Fujita's credit card. At a hear-ing, the Prosecution alleged that Goro's cred-it card had been used by Defendant to rent a couple of automobiles in November and De-cember 1993, and that a dispute later devel-oped over repayment of the debt. The Pros-ecution argued that this evidence established a motive, namely, that Defendant was having financial difficulty at the time. Defense counsel argued that the debt was remote in time and unrelated to the present case. The trial court granted the motion and excluded the evidence. The trial court found that "the issue raised is not so much centered around the Defendant's liability and obligation and/or financial situation, but more as a dis-pute between himself and Mr. Fujita over the payment of the credit card charge. And

---

**30.** Although the reliability of luminol and phenol-phthalein tests is not at issue here, we note that the trial court ruled that the tests were "scienti-fically reliable and valid."

also it is not within the time period of this offense as well." Thus, the trial court apparently concluded that the evidence was not relevant under HRE Rules 401 and 402.[31]

■ In its cross-appeal, the Prosecution argues that the trial court erred in excluding the evidence because it was relevant. We apply the right/wrong standard of review to relevance determinations under HRE Rules 401 and 402. *Kealoha v. County of Hawai'i,* 74 Haw. 308, 314–15, 844 P.2d 670, 674, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993).

We believe that the trial court did not err in excluding the evidence. The fact that Defendant used Goro's credit card to rent a car does not mean that he was in financial difficulty. It may simply have been more convenient to use Goro's credit card, Defendant may not have had any credit cards, or the rental car agency may have required a credit card. Furthermore, a dispute over repayment of the debt does not mean that Defendant was financially unable to pay it. The dispute could have involved confusion over the amount due or the time within which it was to be repaid. The evidence simply indicated that there had been some kind of disagreement involving Goro's credit card and nothing more. Additionally, these events occurred months prior to the deaths of the Fujitas. Thus, the credit card issue was irrelevant, and the trial court properly excluded the evidence under HRE Rules 401 and 402.

### 4. *Mistrial Based on the Prosecution's Use of Peremptory Challenges Against "Local" People*

On January 23, 1995, jury selection in the present case commenced. When the Prosecution exercised its seventh peremptory challenge, defense counsel argued:

Your Honor, we at this point apprise the Court that we feel there may be improper dismissal of jurors based on racial bias by the prosecution. [Prosecutor] is dismissing Native Hawaiians, local people routinely. The State law is very clear in this matter.... And our position is that [Prosecutor] is targeting local people and removing them from the jury.

The trial court subsequently found that six out of the seven peremptory challenges exercised by the Prosecution reflected persons of "local ethnic background" and eventually granted Defendant's mistrial motion. However, when the Prosecution asked the trial court for a definition of "local," the court responded: "Well, counsel, I think we know what we all mean by that."

In its cross-appeal, the Prosecution argues that under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the defendant must first make a *prima facie* showing that the prosecutor is excluding members of a "cognizable racial group." Only then does the burden shift to the prosecution to come forward with a race-neutral explanation for the challenges. *See also Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *State v. Levinson,* 71 Haw. 492, 795 P.2d 845 (1990); *State v. Batson,* 71 Haw. 300, 788 P.2d 841 (1990). In the present case, the trial court found that the Prosecution was excluding persons of "local ethnic background." The Prosecution argues that the term "local" does not refer to a cognizable racial group. Defendant, however, argues that "local" people are indeed a cognizable racial group in Hawai'i.[32]

■ Whether a group is a cognizable racial group is a question of fact. *Alen v.*

---

**31.** HRE Rule 401 provides:

**Definition of "relevant evidence".** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

HRE Rule 402 provides:

**Relevant evidence generally admissible; irrelevant evidence inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii, by statute, by

these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

**32.** Defendant also argues that the peremptory challenge issue is both moot and untimely. Defendant argues that the jury as originally constituted cannot be reinstated and, therefore, the Prosecution has no remedy. However, if this case is remanded for retrial, the trial court will have to conduct jury selection all over again. The trial court might then order another mistrial based on discriminatory peremptory challenges. Thus, the Prosecution's remedy would be an im-

*State,* 596 So.2d 1083, 1085 (Fla.Ct.App.1992) (holding that the decision as to whether Hispanics are a cognizable racial group is a question of fact) (citing *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954)), *decision approved,* 616 So.2d 452 (Fla.1993). Therefore, we review this matter under the clearly erroneous standard.

However, we believe that the record in the present case is not sufficiently developed for us to determine whether the trial court's decision was clearly erroneous. Our review is severely impeded by the trial court's failure to define the term "local" people. As the Prosecution correctly suggests, the word "local" is extremely obscure and could mean many things.[33] Because we have no idea what the trial court meant by "local" people, we do not even have a starting point in conducting our analysis.

Even if the trial court had provided a definition of "local" people, the record does not indicate what criteria the court applied in deciding cognizability. Federal courts have applied the following factors in determining the cognizability of racial or ethnic groups under *Batson:*

(1) the group must be definable and limited by some clearly identifiable factor, (2) a common thread of attitudes, ideas or experiences must run through the group, and (3) there must exist a community of interests among the members, such that the

groups interests cannot be adequately represented if the group is excluded from the jury selection process.

*United States v. Di Pasquale,* 864 F.2d 271, 277 (3d Cir.1988) (considering whether Italian–Americans are a cognizable racial or ethnic group), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989); *United States v. Sgro,* 816 F.2d 30, 33 (1st Cir.1987), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1021, 98 L.Ed.2d 986 (1988).

█ In addition, the record does not indicate what evidence the court relied upon in deciding that "local" people are a cognizable racial or ethnic group. Conclusory allegations are an insufficient evidentiary basis for a finding of cognizability; rather, a factual showing of the cognizability of the group is required. *Di Pasquale,* 864 F.2d at 276–77; *Sgro,* 816 F.2d at 33.

Therefore, because the trial court has not provided us with an adequate record to determine whether "local" people are a cognizable racial or ethnic group, we express no opinion on the subject. Should this issue arise again during a possible retrial, the trial court is instructed to define what it means by "local" people, to conduct an evidentiary hearing on cognizability, and to make the necessary factual findings.

### III. *CONCLUSION*

Defendant's arguments on appeal are meritless, with the exception of his challenge to

---

plicit instruction to the trial court not to order another mistrial on the basis of discrimination against "local" people. Because a remedy exists, the issue is not moot.

Defendant also argues that the trial court's peremptory challenge order granted Defendant a new trial and that the Prosecution should have immediately appealed it. Defendant notes that HRS § 641–13(3) provides that the Prosecution may appeal "[f]rom an order granting a new trial." Because the order was not immediately appealed, argues Defendant, the issue is now untimely. However, Defendant overlooks the distinction between a *new trial* and a *mistrial.* " 'Mistrial' is equivalent to no trial and is a nugatory trial while 'new trial' recognizes a completed trial which for sufficient reasons has been set aside so that the issues may be tried de novo." *Black's Law Dictionary* 1002 (6th ed.1990). HRS § 641–13(3) applies to *new trials* granted after the verdict or finding of guilt pursuant to HRPP Rule 33; it does not apply to

*mistrials.* The present case involves a *mistrial;* therefore, the Prosecution was not required to immediately appeal the mistrial order, and the peremptory challenge issue is not untimely.

**33.** We can identify at least six possible meanings of "local" people: (1) Hawai'i residents; (2) persons born in Hawai'i; (3) persons who at least attended high school in Hawai'i; (4) non-Caucasians; (5) non-Caucasians plus any Caucasians born in Hawai'i, *i.e.,* everyone except mainland Caucasians; and (6) persons who accept the social and cultural values prevalent in Hawai'i, especially racial tolerance. *See* John F. McDermott, Jr. et al., *People and Cultures of Hawaii—A Psychocultural Profile* 230–31 (1980); Dennis M. Ogawa, *Kodomo No Tame Ni—For the Sake of the Children* xx-xxi (1978). In addition, at various times, defense counsel apparently used the term "local" to refer to: (1) Native Hawaiians; (2) persons with dark skin; and (3) non-Japanese. It is not clear which of these possible definitions, if any, the trial court applied.

the mandatory minimum sentences. Under *Garringer,* a defendant cannot be sentenced to mandatory minimum terms if he was an accomplice and did not actually use a firearm. Because it is impossible to determine from the record whether the jury convicted Defendant as a principal or as an accomplice, we must vacate his mandatory minimum sentences. Pursuant to the procedure established in *Garringer,* we will withhold judgment on Defendant's convictions for thirty days. If the Prosecution, within that time, consents to resentencing without mandatory minimum terms under HRS § 706–660.1, we will affirm the convictions and remand for resentencing. If, on the other hand, the Prosecution does not consent, we will vacate the convictions and remand for retrial.

As for the Prosecution's cross-appeal, if the Prosecution consents to resentencing without the mandatory minimum terms, then all the issues raised in the cross-appeal are moot. If the Prosecution does not consent, then the case is to be retried in a manner consistent with our disposition of the issues in the cross-appeal.

## ADDENDUM TO THE OPINION OF THE COURT

The opinion of the court, filed on September 16, 1997, withheld judgment on Defen-

dant–Appellant/Cross–Appellee Raita Fukusaku's (Defendant's) convictions of two counts of murder in the second degree for thirty days pending the receipt of consent from the State of Hawai'i (the Prosecution) to resentencing of Defendant without mandatory minimum terms under Hawai'i Revised Statutes (HRS) § 706–660.1 (1993).

On September 18, 1997, the Prosecution, by and through Caroline M. Mee, Deputy Prosecuting Attorney for the City and County of Honolulu, filed a timely consent to resentencing of Defendant without mandatory minimum terms.

Pursuant to the Prosecution's consent and in accordance with the opinion of the court,

IT IS HEREBY ORDERED that Defendant's convictions of two counts of murder in the second degree are affirmed; however, the case is remanded to the circuit court for resentencing of Defendant without mandatory minimum terms under HRS § 706–660.1.